COMMONWEALTH *vs.* MAUD M. WATERMAN & another.

Suffolk.    Nov. 28, 1876. — Jan. 9, 1877.    ENDICOTT & LORD, JJ., absent.

A conspiracy to cause a marriage falsely to appear of record, and to obtain for that purpose from a justice of the peace a false certificate thereof, and from other parties false assertions that they were witnesses to the ceremony, with intent to prevent a person from contracting another marriage, is an indictable offence.

An indictment for conspiracy alleged that B., C., D., E. and F., with intent to cause it falsely to appear of record that A. was lawfully married to B., and to prevent A. from contracting another marriage, conspired together that C., falsely representing himself to be A., should give notice of the intended marriage of A. and B. to the city registrar, and should obtain from him the certificate required in such cases by law; that D., a justice of the peace, should falsely issue a certificate of the marriage of A. and B., alleged to have been solemnized by him pursuant to the notice; that E. and F. should falsely assert that they were present at the marriage as witnesses; and that B. should cause the false marriage certificate to be recorded in the office of the city registrar and assume publicly to be the wife of A., and that C., D., E. and F. should declare such assumption true. The indictment further alleged that the acts proposed were done, and concluded in the usual form. *Held,* that the indictment was sufficient.

On the trial of an indictment for conspiracy to cause the marriage of A. to B. falsely to appear of record, the testimony of A. that he was never married to B., and that no marriage ceremony was ever performed between them, is admissible.

On the trial of an indictment for conspiracy, evidence of conversations with one of the defendants, involving by way of admission the guilt of others, is competent, if, aside therefrom, there is sufficient to justify the inference that they were parties to the conspiracy.

On the trial of an indictment for conspiracy to cause a marriage falsely to appear of record, a letter written by one of the defendants, under an assumed name, offering for a sum of money to prove the marriage void, is competent in connection with an offer of evidence, which is afterwards produced, that it was written by him, upon the question of motive, and as an admission that there was no legal marriage.

On the trial of an indictment for conspiracy, a letter received by one of the defendants from his housekeeper, who was intimately acquainted with his affairs, advising him to disguise himself for the trial, is admissible.

On the trial of an indictment for a conspiracy to cause the marriage of A. to B. falsely to appear of record, the presiding judge refused to instruct the jury, as requested by the defendants, that if A. lived with B. as his wife, and so held her out, they were in fact husband and wife, and if B.'s sole purpose was to have the formal record of their marriage appear, then she was guilty of no criminal offence. *Held,* that the defendant had no ground of exception.

On the trial of an indictment for conspiracy, alleging that B., C., D., E. and F. conspired together to cause the marriage of A. to B. falsely to appear of record, with intent to prevent A. from contracting another marriage, there was evidence that C., personating A., gave notice of intention to marry, and received from the city

registrar the certificate required by law; that D., a justice of the peace, issued a false certificate of the marriage; that E. and F. pretended that they were witnesses thereto; and that B. caused the false certificate to be recorded, and assumed the name and held herself out to be the wife of A. The presiding judge refused to rule that there was no evidence to support the indictment, and no evidence of any criminal purpose on the part of the defendants. The judge also instructed the jury that C. was entitled to an acquittal, unless they were satisfied that he did something more than to obtain the notice, and had no knowledge of or was not a party to the conspiracy. *Held*, that the defendants had no ground of exception.

INDICTMENT for conspiracy as follows:

"The jurors for the Commonwealth of Massachusetts, on their oath present, that Edgar R. Butterworth, Maud M. Waterman, Lizzie Douglass, Henry M. Ingraham and Moses S. Marshall, all of said Boston, on the sixteenth day of March, in the year one thousand eight hundred and seventy-five, at Boston aforesaid, with wicked intent to cause it falsely to appear of record that one Roderick D. Richardson was lawfully married to said Maud, and with intent to injure said Richardson thereby, and to prevent said Richardson (he, said Richardson, then and ever since being an unmarried man) from contracting any marriage, except with said Maud, and with intent to cheat and defraud, unlawfully and wickedly did combine, conspire, confederate and agree together that said Marshall should then and there apply in person to Nicholas A. Apollonio, the registrar of births, deaths and marriages, duly appointed and qualified, in said city of Boston, to record all facts concerning marriages, and should falsely represent to said registrar that he, said Marshall, was said Roderick D. Richardson, (said Richardson then being a citizen of said Boston, other than said Marshall,) and should, in the office of said registrar in said Boston, give notice and state that said Richardson and said Maud were both then residents of said Boston, and that said Richardson and Maud then intended shortly to be joined in marriage at said Boston, and should request and obtain from said registrar the certificate of said notice in such case required by law to be given by said registrar; that hereafter at said Boston, said Butterworth (he, said Butterworth, being then and there a justice of the peace for said county of Suffolk, duly commissioned and qualified) should falsely, and before, and without any marriage between said Maud and said Richardson, write a certain certificate and writing under

the hand of and signed by him, said Butterworth, as such jus-tice, purporting to be a copy of a truthful and genuine record of a marriage, therein falsely to be alleged to have been solemnized by said Butterworth, as such justice at said Boston, between said Richardson and said Maud, pursuant to said notice, and said cer-tificate to be obtained from said registrar in manner and form as aforesaid; and that said Douglass and Ingraham should there-upon falsely and publicly pretend to have been present at such marriage as witnesses thereto; and that said Maud should there-upon, without the knowledge of said Richardson, cause to be delivered such copy of record of marriage (signed by said But-terworth, as aforesaid) to said registrar, at his said office, for record, as and for a true and genuine copy of a truthful and gen-uine record of marriage, and that thereafter said Maud should publicly assume to be the wife of said Richardson, and that the said Butterworth, Douglass, Ingraham and Marshall should de-clare such assumption to be just and true within their own knowledge; and the jurors aforesaid, upon their oath aforesaid, do further present that then and there, in pursuance of said con-spiracy and agreement, said Marshall did then and there apply to said registrar and give said notice, and then and there pre-tend to be said Richardson, and did then and there receive such certificate of said notice from said registrar; and said Butter-worth did thereafter, to wit, on said day, at said Boston, as such justice, write and sign such false copy of record as and for a true certificate and copy of a truthful record of marriage, and said Douglass and Ingraham did then and there publicly declare themselves to have been witnesses of such marriage, and said Maud did thereafter cause said writing, signed by said Butter-worth, to be duly entered and recorded in the office of said reg-istrar, at said Boston; and said Maud did thereafter publicly say and aver falsely, that she, said Maud, was the lawful wife of said Richardson, and said Butterworth, Douglass, Ingraham and Marshall did declare the same to be true as of their own knowl-edge.

" Whereas, in truth and in fact, said Marshall then and there was not Roderick D. Richardson, but said Richardson was a man other than said Marshall; and said Roderick did not then and there, nor did he at any time, intend to be joined in marriage

with said Maud ; nor did said Richardson desire said notice to be given to said registrar by said Marshall, or by any other person, or by himself, said Richardson ; nor did he, said Richardson, at any time before said notice was given as aforesaid, know that the same was to be given ; and whereas, in truth and fact, said Richardson was never joined in marriage by said Butterworth to said Maud, nor was he, said Richardson, ever married to any person whomsoever, nor was there any truthful record of any marriage between said Maud and said Richardson, all of which said Butterworth, Douglass, Waterman, Ingraham and Marshall, at the time they so combined, confederated and agreed together as aforesaid, and at the time they committed the acts hereinbe fore set forth, then and there all well knew. And so the jurors aforesaid, upon their oaths aforesaid, do say that said Butterworth, Marshall, Ingraham, Douglass and Waterman, at said Boston, on said sixteenth day of March, did unlawfully combine, conspire, confederate and agree together, by the means and in form aforesaid, to cause said Richardson falsely to appear of record to be married to said Maud, against the law, peace and dignity of said Commonwealth."

In the Superior Court, before the jury were empanelled, the defendants Waterman and Marshall, who alone were tried, moved to quash the indictment, for the following reasons : " 1. No common purpose is alleged against the defendants. 2. No common and unlawful purpose is alleged against the said defendants ; and no unlawful purpose is alleged ; and no criminal object is alleged. 3. It does not appear from said indictment that the acts alleged, or any of them, were unlawful and criminal acts, and no unlawful and criminal act is alleged. 4. It does not aver that the defendants performed the acts alleged for the purpose of effecting any wrong or injury to any person, or class of persons, or for the purpose of effecting any wrong or injury whatever. 5. It does not aver that the acts alleged to have been performed did result in any wrong or injury to the public, or to any person or persons. 6. The purpose alleged, and the acts alleged, and as alleged, are insufficient to sustain any charge of conspiracy cognizable by the laws of this Commonwealth. 7. The indictment sets forth no illegal means agreed upon, or concerted by the parties, and does not charge a conspiracy to do

a criminal act, or effect an object by any criminal means; and the allegations respecting the purpose and object and means are insufficient, and insufficiently stated. 8. The indictment is uncertain, indefinite, insufficient, and bad for duplicity, and does not set forth any criminal offence. 9. There is no allegation that Nicholas A. Apollonio had lawful authority to issue a marriage certificate, or the certificate which is alleged to have been issued by him. 10. There is no sufficient averment that said Butterworth was authorized to solemnize a marriage, and had legal authority so to do."

*Aldrich*, J., overruled the motion. The defendants were then tried, and a bill of exceptions, in substance as follows, was allowed:

Nicholas A. Apollonio testified that he was the city registrar of Boston, and produced the records of his office, showing that on March 13, 1875, a marriage license was issued to Roderick D. Richardson and Maud M. Waterman, both of Boston, (a notice of intention of marriage having been given on the same day,) and also the certificate of marriage between them, which recited that Roderick D. Richardson and Maud M. Waterman were joined in marriage at 18 Chapman Place, Boston, on March 16, 1875, by Edgar R. Butterworth, Justice of the Peace.

Franklin D. Rideout testified that he was a clerk in the office of the city registrar of Boston, that he saw the man who applied for the marriage license to Maud M. Waterman, and that he gave the name Roderick D. Richardson; that subsequently he was taken by a detective to identify the defendant Marshall, and he could not identify him as the man who took the license for said Roderick and Maud; but at this interview Marshall said to him that he was the man who applied for said license.

Roderick D. Richardson was asked whether or not he was ever married to said Maud. To this the defendants objected; but the judge allowed the question to be put. The witness said he never was married to said Maud; that he first saw her in a house of ill-fame on Oak Street, in Boston, where she then lived, and that he visited her there, that she moved from the house in Oak Street to a house in Warrenton Street, Boston, and he visited her there, and at other places, and paid her board, and all

her bills and expenses; that in October, 1874, he went with her to the house of Mr. and Mrs. Shorey, No. 18 Chapman Street, Boston, where she boarded, and where the witness went by the name of Waterman, and was there known only by that name, and as her husband; that she always spoke of him there, in the presence of others, as her husband, and of herself as his wife, and that he made no objection to it; that he visited her there in the evening, and was alone with her in her room; that by his order she had, and kept, an account for small and limited amounts in his name, Roderick D. Richardson, at a shop in Boston, during all of the time she and he so lived and stayed at Chapman Street, which was until the last of April, 1875, when he left her there; that during all of the time of his acquaintance with her, he lived at his father's house in Waltham Street, Boston; that on March 12, 1875, he had informed her of his purpose to sever his relations with her, and on that day he received a letter from her; * that he went and saw her on the evening of the day that he received the letter, and that she requested him to come on the following Monday, but surely on the next Tuesday night; that on the next Tuesday, March 16, 1875, he went and saw her at her room in the house in Chapman Street, arriving there at about half-past six in the evening, and remained there until eleven, or later; that when he went there one Mrs. Birdsell was there, and Maud had a white dress on; that he asked what it meant, and Mrs. Birdsell said she had been trying to find out, but could not; that Maud took off the white dress, and Mrs. Birdsell went away; that after Mrs. Birdsell left, Butterworth, Ingraham and Douglass all came into the room of Maud, and, while they were there, Douglass asked Maud to go up-stairs and put the white dress on, and Maud and Douglass left the room and went up-stairs, and Maud put on the white dress, and they returned to the room, when Butterworth said he had been looking around for a room for her (Maud), and took out and produced a paper, on which were the names of various houses; that Butterworth said, "That is all I came up for;"

---

* This letter was put into the case. In it the writer requested Roderick to come and see her on Monday or Tuesday next, and stated that they would probably never meet again, except as strangers.

and they, Butterworth, Ingraham and Douglass, left together. The district attorney asked the witness whether or not any marriage ceremony had ever taken place between him and said Maud. To this the defendants objected, but the question was allowed to be put. The witness answered that there had not.

Edwin C. Holmes testified that he knew Richardson and the defendant Maud; that he had a conversation with her about buying the said white dress, which she bought at the shop where the witness was a clerk, and that she said she expected to wear the dress at a ball at Paine Hall, with the witness; that she once asked him what Roderick's mother's middle name was.

Lizzie Douglass, one of the defendants named in the indictment, and who pleaded guilty to said indictment, testified that on March 16, 1875, she was at the house of Mrs. Shorey, No. 18 Chapman Street, Boston; that she went there between seven and half-past seven, P. M.; that said Maud, Richardson and Butterworth were there; that she asked Maud to put on the white dress, and they went up-stairs, and Maud put the dress on, and with the witness returned to her room, where Ingraham, Butterworth and Richardson were; that the witness made the remark that she looked well enough for a bride. She further testified that no ceremony of marriage took place on that occasion.

The government asked the witness to state conversations which took place between herself and the defendant Butterworth before March 16, to all of which the defendants objected; but the judge admitted them as the admissions of fellow-conspirators; whereupon the witness said that some time before March 16, Butterworth told her that he wanted her to meet said Maud; that at that time she was a stranger to her; that Butterworth said they wanted to get up a marriage; that only the witness and Butterworth were then present; that Butterworth said he was going to get a commission as justice of the peace, and would have the marriage in another county; that several weeks before March 16, the witness, together with Maud, Butterworth and Ingraham, went to the house of the defendant Marshall, at Boston Highlands, when she and Maud left the room, when Marshall saw Butterworth and Ingraham; that after this date she met Butterworth at the Tremont House in Boston, when the plan was talked over as agreed upon, which was finally carried

out on March 16, 1875, in the room of the defendant Waterman, and that it was agreed that she and Ingraham should pretend to be witnesses to the marriage which was to be pretended; that she signed the certificate of marriage, and voluntarily, with full knowledge of what it was and of what she was doing, and that afterwards she had always declared that it was a true certificate, and had declared that the marriage did take place, and that she witnessed it; that she never made any other statement until after she had been for some time in jail under arrest on this indictment, and about two weeks before she was bailed out through a detective, by order of the district attorney, when she first made a different statement to the detective; that she had before that time spoken to many persons about the matter of the marriage, and that she had always declared that she did witness the marriage and that the certificate was true; that she had no acquaintance whatever with Marshall, except as aforesaid.

Chase Philbrick testified that he was one of the state detective force, and was with detective Pinkham when he arrested Marshall; that he, Philbrick, had a conversation with Marshall in Montreal; that Marshall asked him if we had a case against him, and said there was nothing in the case, and that when he was arrested in Newburyport by Pinkham, he arrested him on something no better. He said all he told Pinkham was, that he went and got a license for Miss Waterman for a marriage; but he said he gave his own name and did not conceal anything. He said, " I suppose you fellows wanted me for something that I have known rather than what I have done." He said he did not represent anybody but himself when he got the license.

Hollis C. Pinkham testified that he was a state detective, and that early in August, 1875, from information received, he wrote to the defendant Marshall, at Newburyport, and that after that he went to Newburyport and arrested Marshall on an indictment for perjury; that Marshall said he went to the city hall, at the request of Maud M. Waterman, and took out the license in question. The witness further testified that he was informed and employed on this case as early as July, 1875; that he went and saw the defendant Maud and talked with her about it as early as July; that she said she would see Richardson with him, and declare in his presence the truth of the fact that they were

married, as certified in the certificate; and that she did after-wards meet Pinkham and Richardson, at the house of Mrs. Shorey, on Chapman Street, and did declare that the marriage was true; that Pinkham, in July and August, 1875, saw said Butterworth and said Ingraham several times about the matter of the marriage, and also Douglass; that Ingraham and Butter-worth remained in Boston until the last of October, 1875, when they left the State on account of other troubles that threatened them, and Pinkham had not seen them since, and did not know where they might be found; that Pinkham had all of the knowl-edge about this in July and August, 1875, that he now has ex-cept what has since been told him by Douglass. This witness further produced a letter which he said Marshall had admitted to him to be his writing, and it was admitted by the judge as a standard of his handwriting. Marshall, in his testimony, more-over, admitted it to be his writing.

Daniel E. Richardson testified that he was a brother of Rod-erick, and that he had received a letter, which was shown to him, and which was offered in evidence, and to which the de-fendants objected; but the judge admitted it, the government offering to produce evidence (which was subsequently given) tending to show that the letter was written by the defendant Marshall. A copy of this letter is printed in the margin.* He further testified that the name of his mother was incorrectly set out in the application for the license.

The defendant Marshall testified to various matters tending to contradict the witnesses for the government; and further tes-tified that the statement made by Douglass about calling at his house, in company with Maud, Butterworth and Ingraham, prior to March 16, 1875, was false; but that all said parties did come to his house together several weeks after March 16, and after the time when Richardson had denied the marriage and begun to make and threaten to make trouble about it; that Butter-

---

* "Boston, Sept. 8th, 1875. D. E. Richardson, Esq.: Dear Sir, — I can furnish evidence enough to make your Brothers merriedge nul & void & will do so for $500. But the money must be depossetted before I will give this. If this is satisfactory you will please address as before I will then see you and arrange the matter hoping to hear from you soon I remain yours truly,

"J. J. Jones. '

worth was then informed that Richardson was making trouble about the marriage, but that he could not do anything about it, as it was all legal and right; that Butterworth then told Marshall that he would tell him all about the matter of a marriage in a day or two after that time ; and that he did do so. The counsel then offered to show the statements and declarations made to Marshall at the interview which took place in pursuance of what was said by Butterworth at the house of Marshall ; but it was objected to, and the judge excluded it.

Marshall also testified that he did not write, and knew nothing whatever about, the letter produced by D. E. Richardson ; that he never had any conversation whatever with any person about the matter of the marriage of Richardson and Maud, except that she and Butterworth requested him to go to the city hall, or get the license for her, until after the time of the marriage. On cross-examination, Marshall testified that he said to officer Pinkham that a woman in Maine, named Wilson, knew about this marriage ; and he testified that he learned this from a man named J. J. Jones, who boarded with him at the Merrimack House, in Newburyport, Massachusetts, for a considerable time in the summer of 1875, and was engaged in silver mining in Newburyport, and whom he heard speak of this marriage several times in said hotel. He also, upon cross-examination, admitted that a certain letter was received by him in Montreal, and was written by his housekeeper, who was intimately acquainted with his affairs, and he admitted that the remark as to disguise and a photograph referred to this case. This letter was then read to the jury, of which the material part was as follows :

" I went to see Butterworth this morning, he did not understand what you wanted of the man or what you wanted him to see the registry for, he said he was glad I called and that I had been a help to him, he was glad enough to know about what to do at the registry and he will look up that man immediately, he wants you to have a picture taken to look as old as possible try and have the hair and whiskers white, and send me to give him before the trial, he says he will use it for your advantage and he says you may depend on him he will do anything he can for you, only he don't want you to write him any more of them overbearing letters."

Mrs. Shorey testified that said Richardson and said Maud came together to her house, No. 18 Chapman Street, Boston, in October, 1874, as husband and wife, she speaking of him in his presence as husband, and he speaking of her as his wife, and that she let them a room with board for the wife; that he had a key to the front door, which also opened the door to their room; that he was there almost constantly, and the same as other married men in the house, but did not take his meals there, but that Maud did; that he furnished all of the money to pay the room-rent and board of Maud, and for all of her expenses; that she never knew that they were not married until a week or two before March 16; that she was then informed by Maud of their intended marriage, and thereupon allowed them to remain; that she knew who came to the house and went to the room of Maud on March 16, in the evening; that she knew that all of the parties who were expected by Maud to be there that evening were there; and that Richardson, Butterworth, Ingraham and Douglass were with Maud together in the room on that evening; that after March 16, Maud was always called Mrs. Richardson; that before March 16, Maud and Roderick were known and called by her Mr. and Mrs. Waterman, and after that time they were known and called by her Mr. and Mrs. Richardson; that Roderick continued to stay at her house with Maud, as he had before done, until about the last of April, 1875, when he went away, but Maud remained there.

Mrs. Birdsell testified that she was present at the room of Maud in the early part of the evening of March 16, 1875, and saw Maud with a new white dress on, Richardson being then present, and she asked Richardson what that white dress meant; to which he replied, " You must ask Maud; " that she did ask Maud, who said she would tell her all about it some time; that she had up to that time known said Roderick as Mr. Waterman.

The defendant Maud testified that she and said Roderick went together to the house of Mrs. Shorey, and there engaged a room as husband and wife, with board for her only; that Roderick went by the name of Waterman; that he had promised to marry during all the time that she lived with him as his wife; that at his request she attended to the matter of obtaining the marriage license, and went to the office of the defendant Butterworth,

who introduced her to Marshall, and requested him to go to the registrar's office for her, which he then did; that at that time she did not know Marshall; that she did not, before March 16, go to the house of Marshall, as testified by Douglass; that on March 16, 1875, in the evening, at the room then occupied by said Roderick and herself, at the house of Mrs. Shorey, she was married to said Roderick by said Butterworth, as a justice of the peace, and Douglass and Ingraham were there as the witnesses of the marriage, and did witness it, and signed the certificate of marriage; that prior to that she and Roderick had agreed to live together as husband and wife, and had done so; that he took her to ride, to places of amusement and to church; that when she got the marriage license she put it in her bureau drawer, where he could see it, and that he did see it before the marriage; that she had an account in his name at a shop in Boston; and that she bought the materials there, on his account, for the white dress, which was got for the purpose of being her wedding dress, and that said dress was made for her wedding dress with his full knowledge; that she did write the letter to said Roderick, which he said he received March 12, in consequence of his having told her that his family had learned, or feared they had learned, about his relations with her, and that he should have trouble with them about it; but that he came to her the evening of the same day that she sent the letter, and told her that he cared more for her than he did for his family, and that he should marry her as he agreed and as it was arranged that he should do, but that he wanted it kept quiet as long as possible, and for that reason they would have the ceremony private, and for witnesses those persons that were selected, because they would not have any interest to talk about the matter or to make it known; that the paper containing the list of rooms, which Richardson testified was brought there by Butterworth on March 16, was brought and left there in February, and not on March 16; that Roderick finally left her and said house at the command of his brother, Daniel E. Richardson, who came to the house and told him to leave, which he then did.

The defendants also introduced in evidence the certificates of the Secretary of the Commonwealth, that Butterworth was duly appointed and qualified as a justice of the peace for Norfolk

County in 1871, and that on March 10, 1875, he was duly appointed and commissioned a justice of the peace for Suffolk County, and qualified as such justice March 13, 1875.

The government proved in rebuttal that no such man as J. J. Jones, and no man named Jones, was known at the Merrimack House, Newburyport, at the time referred to by Marshall, and that no such name appeared on the register of that hotel.

The government further called in rebuttal the dress-maker who made the white dress alluded to for said Maud, who testified that Maud, in ordering it, said it was for a ball.

The defendants asked the judge to instruct the jury as follows : " 1. If .Roderick D. Richardson lived and cohabited with Maud as his wife, and upon the agreement that they would be husband and wife to each other, they are, and were, husband and wife.

" 2. If said Richardson held Maud out to the public, and to Mr. and Mrs. Shorey, and others, as his wife, then the law makes them husband and wife, and they were, and are in fact and in law, husband and wife.

" 3. Upon the evidence in the case Maud was, at the time of said marriage, or alleged marriage, the lawful wife of said Richardson, and he was her lawful husband.

" 4. If Richardson held, and had held, Maud out to the public, and to Mr. and Mrs. Shorey and others, as his wife, and her sole purpose was to have the formal legal evidence of the fact of their marriage appear, then she was guilty of no criminal offence, nor of doing anything which was wrongfully injurious to said Richardson ; and especially if they had, in fact, mutually agreed to be husband and wife, and had acted in pursuance of such agreement.

" 5. The record of the city registrar is presumptive evidence of the marriage of said Maud to said Richardson.

" 6. It is not competent for the government in this case to contradict and impeach that record by oral evidence.

" 7. There is no evidence in this case tending to show any unlawful or criminal purpose or object on the part of these defendants, or either of them, and there is no evidence of unlawful or criminal act done or performed by these defendants, or either of them, to accomplish any lawful or proper object or purpose.

" 8. There is no evidence in this case sufficient to support **any** charge of conspiracy contained in this indictment.

" 9. If Marshall had no knowledge of any unlawful purpose, and was not a party to any agreement and to any unlawful act, or any act by unlawful means in confederation with said Maud, or any other of the defendants, at the time when he obtained said license, then he is entitled to an acquittal; and that, although he did afterwards do all that the government case alleges and claims against him."

The judge gave the instruction contained in the 5th request, but declined to give the 1st, 2d, 3d, 6th, 7th and 8th, and also declined to give the 4th; but at the same time stated to the jury that the fact that Richardson held the defendant Waterman out as his wife, if he did so, was evidence to be considered in connection with other evidence upon the issue as to whether there was a conspiracy, or whether there was a legal marriage between Richardson and Waterman. The judge also declined to give, in the language of the request, the 9th instruction asked for; but did instruct the jury that Marshall would be entitled to an acquittal, unless the evidence in the case was sufficient to satisfy them that he did something more to promote the conspiracy, if there was one, than to obtain the license; if he had no knowledge of any unlawful purpose, and was not a party to any agreement to do an unlawful act or any act by unlawful means in confederation with the defendant Waterman, or any other of the defendants, at the time when he obtained the license. The judge gave other and full instructions, not excepted to, on all questions of law involved in the case.

The jury returned a verdict of guilty; and the defendants alleged exceptions.

*J. F. Pickering*, for the defendants.

*W. C. Loring*, Assistant Attorney General, (*C. R. Train*, Attorney General, with him,) for the Commonwealth.

COLT, J. A conspiracy to cause it falsely to appear of record that a certain person is lawfully married to one of the parties, and to obtain for that purpose from a justice of the peace a false certificate of marriage, duly recorded, by means of false personation and false representations, followed by false assertions of other parties to the conspiracy that they were present as wit-

nesses to the ceremony, with intent to injure and prevent such person from contracting any other marriage, is an indictable offence.

The indictment here alleges such a conspiracy with sufficient formality. The main purpose, with the means agreed to be employed in its accomplishment, make the agreement of the parties, to do the things charged by concerted action, criminal. It is not always essential that the acts contemplated should constitute a criminal offence, for which, without the element of conspiracy, one alone could be indicted. It is the combination of two or more to do something unlawful, either as a means or as an ultimate end, which constitutes the crime; and many acts not punishable by indictment have been held to come within this definition. It is said to be sufficient if the end proposed, or the means to be employed, are by reason of the power of the combination, particularly dangerous to the public interests, or particularly injurious to some individual, although not criminal. Thus a conspiracy to cheat by false pretences without false tokens, when a cheat by such pretences by one person was not punishable, was held indictable in *Commonwealth* v. *Boynton*, cited in *Commonwealth* v. *Hunt*, Thach. Crim. Cas. 609, 640. So it is an indictable conspiracy for a man and woman to marry by the use on the part of the man of the name of another, for the purpose of raising a specious title to the estate of the person whose name is assumed; and it is for the jury to say whether there was an intention to do a future injury to him. *The King* v. *Robinson*, 1 Leach, (4th ed.) 37. And so to persuade a young woman, by false representations, to leave the protection of her parents' house with a view to facilitate her prostitution; *Rex* v. *Grey*, 9 How. State Trials, 127; or to procure by false means the recognition upon the stock exchange of stock in a company not genuine; *The Queen* v. *Aspinall*, 1 Q. B. D. 730; or to secure the election of certain persons as directors of an insurance company by issuing false policies. *State* v. *Burnham*, 15 N. H. 396. See also *Commonwealth* v. *Hunt*, 4 Met. 111.

It is charged that the main purpose of the defendants in this case was to cause a marriage between certain parties falsely to appear of record. This, if successful, would directly tend to impair the value of a public record, necessary for the security of

the marriage relation, and the protection of the important rights arising therefrom and, if this were the only charge made, the prosecution might well be maintained, within the rule above stated. But the corrupt agreement in this case embraces the unlawful means which were to be used, as well as the unlawful end to be attained.

It is, among other things, averred in substance that the defendants, with intent as above stated, and with further intent to defraud, unlawfully conspired together that one of them should give notice of an intended marriage to the city registrar, falsely representing himself to be one of the parties named therein, and should obtain the certificate of notice required in such cases; and that thereupon another of the defendants, who was a justice of the peace, should falsely issue a marriage certificate, to be delivered for record and to be recorded by the city registrar, as a true certificate of an actual marriage.

It is well established that, when an unlawful conspiracy is entered into, all acts done by any of the parties in pursuance of the combination, although done separately and apart from the others, are in law the acts of all. *Commonwealth v. O'Brien*, 12 Cush. 84. All the defendants would be criminally liable for the criminal act or acts of any one or more of the conspirators, and it is enough to support the prosecution if any one act contemplated is of this description.

The statutes provide that the record of a marriage kept by the person before whom the marriage is solemnized, or by the clerk or registrar of any city or town, shall be received in all courts as presumptive evidence of such marriage. Gen. Sts. c. 106, § 21; c. 21, § 6. They further provide that whoever falsely makes or utters a public record, or a certificate of a justice of the peace or other public officer, in relation to a matter wherein such certificate may be received as legal proof, with intent to injure or defraud any person, shall be punished, in like manner as the making and uttering a forged instrument is punished. Gen. Sts. c. 162, §§ 1, 2.

It cannot be doubted that the making and issuing a false certificate of marriage by a justice of the peace, if not indictable, would at least justify impeachment and removal from office and it is enough to support this indictment that one of the acts

contemplated as a means by these defendants would lead to such a result.

The defendants' exceptions to the admission and rejection of evidence at the trial are not well taken.

The conspiracy alleged necessarily required proof of the false and fraudulent character of the record, which is at most only presumptive proof of the marriage. Gen. Sts. *c.* 106, § 21. Richardson was, therefore, properly allowed to state that he was never married to the person named, and that no marriage ceremony was ever performed between him and her. *Commonwealth* v. *Norcross*, 9 Mass. 492.

There is nothing to show that the government witness Douglass was not properly allowed to state the conversations had with one of the defendants, involving, by way of admission, the guilt of others. The order in which testimony is adduced is largely in the discretion of the court; and whether a *primâ facie* case had then been made out against the parties to be affected or not, it is enough that upon the whole case, independently of the evidence objected to, there was sufficient to justify the inference that they were parties to the conspiracy. For the same reasons the letter written by Marshall under a feigned name was properly admitted, upon the offer of evidence subsequently produced that it was written by him. The contents of the letter were admissible as showing a corrupt motive on the part of the writer and as an admission that there was no legal marriage.

The letter to the defendant Marshall from his housekeeper, produced and admitted on his cross-examination to have been received in Montreal, advising him for the purpose of this case to disguise himself, in view of the fact that the writer was intimately acquainted with his affairs, was properly admitted in evidence as showing Marshall's relation to the case and his means of information.

The court gave full instructions, not excepted to, on all the questions of law involved in the case. The instructions requested, so far as they were refused, were properly refused. The fact that Richardson had lived with the defendant Waterman and had held her out as his wife, would not make the purpose of the alleged conspiracy less criminal and unlawful. There was evidence sufficient to support the indictment.

*Exceptions overruled.*