COMMONWEALTH *vs.* RODOLPHE G. BESSETTE
(No. 1 of 1966)
(and two companion cases).

Suffolk.    April 4, 1966. — June 15, 1966.

Present: WILKINS, C.J., SPALDING, CUTTER, KIRK, & SPIEGEL, JJ.

*Conspiracy.   Public Works.   Contract,* For public works, With Common-
wealth.   *Words,* "Unlawful."

Discussion of conspiracy as a criminal offence where the object is not a
   crime and the contemplated means of accomplishing that object are not
   criminal, but either the object or the means are "unlawful."   [152–154]
Where neither the object of a conspiracy nor the means used to accom-
   plish the object involve criminality, the conspiracy is not criminal un-
   less there is a substantial injurious effect upon the public, the public
   interest, or some individual.   [154]
No crime was charged by an indictment alleging merely that with respect
   to a designated contract for public work. with the Commonwealth the
   defendants conspired together and with others "to assign the work"
   without the previous written consent of the Commonwealth's represen-
   tative, and that such assignment was "in violation" of a certain article
   of the "Standard Specifications" of the contract and "unlawful," as the
   defendants and the others "well knew."   [156–157]

THREE INDICTMENTS found and returned in the Superior
Court on November 29, 1961.

Motions to quash the indictments were heard and denied
by *Donahue, J.*

*George L. Rabb* (*Paul Levenson* with him) for the de-
fendant.

*Richard E. Bachman,* Assistant Attorney General, for the
Commonwealth.

CUTTER, J.   Bessette, one LeBlanc, and one Paquette
were charged in indictments,[1] returned in November, 1961,

---

[1] The indictments were essentially the same in form except that indictment
No. 8175 referred to contract No. 2063 between the Commonwealth and two
men named Chace who were copartners doing business as Marine Development
Co. and indictment No. 8176 referred to contract No. 2074 between the Com-
monwealth and Marine Dredging Corp.   Indictment No. 8174, which related
to contract No. 2038, charges, in part, that on or about January 1, 1960, "and

with conspiracy to violate art. 65 of the "Standard Specifications"[2] of the Division of Waterways (the division) of the Department of Public Works (the department) in connection with certain dredging contracts. To each contract the Commonwealth through the department and the division was a party. See *Commonwealth* v. *Bessette,* 345 Mass. 358. Bessette, who in 1959 and 1960 was the head of the division, was found guilty on each indictment. Our discussion of the motions to quash the indictments will be clarified by a brief summary of the background of the case shown by the evidence.

The commissioners of the department on June 1, 1960, after a considerable delay voted to award, upon three sets of bids,[3] dredging contracts to the low bidders, as follows: contract No. 2074 (Popponesset Bay and Creek, Mashpee)

---

on divers other days . . . between that day and the day of the presenting of this indictment [the defendants] did conspire together and with Arnold B. Chace and Malcolm G. Chace . . . [Jr.] to assign the work under [c]ontract Number 2038, dated the first day of June . . . [1960] made by and between the Commonwealth . . . by its Department of Public Works, and . . . [the Chaces], copartners, doing business as Marine Development Co., without the previous written consent of the said Department of Public Works . . . such assignment of work being unlawful . . . and in violation [of] the provisions of Article Sixty-five of the Standard Specifications of the Division of Waterways of the Department of Public Works . . . as they, the said . . . Bessette . . . LeBlanc . . . Paquette . . . and . . . [the Chaces] well knew." The Commonwealth's answers to Bessette's motion for a bill of particulars were scanty and uninformative.

[2] Article 65 of the "Standard Specifications" reads, in part, "Subletting or Assignment of Contract. The Contractor shall give his personal attention constantly to the faithful prosecution of the work, shall keep the same under his personal control, and *shall not assign* by power of attorney or otherwise, *or sublet, the work or any part thereof without the previous written consent of the* . . . [*Commonwealth*] and shall not . . . assign any of the moneys payable under this agreement, or his claim thereto, unless by and with the like consent of the . . . [Commonwealth]. He shall be responsible for the acts and omissions of his sub-Contractors, if any, and of all persons directly or indirectly employed by him or them in connection with the work . . ." (emphasis supplied).

[3] Bids were received and accepted as follows:

| Bids opened | Contract | Price per cubic yard Contractor |
|---|---|---|
| July 14, 1959 | Contract No. 2038 (Buttermilk) | $1.67 Development, |
| November 24, 1959 | Contract No. 2063 (Parker's River) | .85 Development, |
| January 19, 1960 | Contract No. 2074 (Popponesset) | .58 Dredging. |

Dredging's bid on contract No. 2074 was the lowest received by the division since 1950. Development was second lowest bidder on that contract at seventy-two cents per cubic yard.

to Marine Dredging Corp. (Dredging); contract No. 2038 (Buttermilk Bay, Wareham) to Marine Development Company (Development); and contract No. 2063 (Parker's River, Yarmouth) also to Development. The contracts were thereafter executed.

Contract No. 2074 was the culmination of a long effort to have the Popponesset area dredged. Interests controlled by the Chaces had planned a real estate development on land surrounding Popponesset Creek. In 1949 and 1955 applications to dredge the creek at private expense had not been approved. Subsequent efforts were made by the Chace interests to get the department to do such dredging on a basis by which, at least in 1956, the Chace interests were to contribute to Mashpee the town's share of the expense. Similar efforts were made in 1958 before the Legislature. See 1958 Senate Bill No. 303; 1958 House Bills Nos. 554, 3257; St. 1958, c. 647. On September 10, 1959, an engineer for the division was instructed by Bessette to make a survey for a "harbor of refuge for small boats" in the Popponesset area, and eventually a project at Popponesset was adopted.

· Sometime in February, 1960, one Buswell, an employee of the Chaces, partners in Development, told Bessette that Development wanted to exchange contracts· Nos. 2038 (Buttermilk Bay) and 2063 (Parker's River), both later awarded to Development, for No. 2074 (Popponesset) which was later awarded to Dredging. Bessette made suggestions with respect to this exchange.

In May, 1960, Wilson, an officer in various Chace enterprises, and Dr. LeBlanc, a director of Dredging, met. Wilson told Dr. LeBlanc that he would not let Dredging place dredged material from Popponesset Creek on the Chace land. Dr. LeBlanc on May 31, 1960, saw Bessette in Wellfleet. On June 1, Dr. LeBlanc with Paquette, Dredging's president and treasurer, met Wilson· again. At this conference, it was agreed that Development would do the Popponesset job· and Dredging would do the "other two jobs . . . with· a price differential . . . in favor of" Develop-

ment. An attorney for the Chaces on June 1, 1960, drew up a memorandum[4] and subsequently a more formal letter agreement dated June 2, 1960, to similar effect was executed.

After the meeting on June 1, Wilson reported by telephone to Bessette ''about swapping the contract[s].'' The contracts were awarded on June 1.

During the summer of 1960 efforts were made to obtain departmental permission for Development to subcontract to Dredging contracts Nos. 2038 and 2063, and for Dredging to subcontract contract No. 2074 to Development. Despite a subordinate's adverse recommendation on contract No. 2074, Bessette recommended approval of the requests to subcontract all three contracts. The commissioners denied these requests.

The voluminous record need not be more fully stated. We recognize, of course, that, although it is not necessary for us to consider the evidence in detail, the trial judge would have been warranted in concluding (a) that Bessette delayed recommending award of the contracts until the low bidders agreed to assign and ''swap'' them; (b) that the awards followed promptly upon the ''swap'' arrangement; (c) that Bessette was fully informed about that arrangement; (d) that Bessette never told the commissioners of the actual arrangement but instead took precautions to conceal it in the face of the commissioners' specific refusal to allow the ''swap''; (e) that Bessette, for reasons not wholly plain from the evidence, was actively supporting Development's efforts to do the dredging at Popponesset in which the Chaces had a special interest because of their land ownership; and (f) that these actions were in some degree pursuant to an understanding with representatives of Development. It could have been found that art. 65 had been employed steadily for the protection of the Commonwealth's interests as a part of the division's contracting policy for

---

[4] The memorandum spoke of Development and Dredging as prime contractor on the contract or contracts to be awarded to them, respectively, and as subcontractor on each job which each such contractor was in fact to perform.

many years. There was other evidence which tended to cast doubt on the propriety of the transactions.

There was evidence that the work called for by the Parker's River and the Popponesset Bay contracts had been fully completed in accordance with the areas and quantities prescribed by the contracts and that payment for each contract had been approved and made. Payment for the work done at Buttermilk Bay had not been made.

The cases are before us (a) on three bills of exceptions dealing with the denial of motions to quash the indictments which were heard by one judge of the Superior Court and (b) upon a substitute bill of exceptions allowed by a different judge who presided at the actual trial. The substitute bill included exceptions to the denial (a) of the motions to quash, and (b) of motions for findings of not guilty, which we need not consider.

1. The three identical motions to quash assert principally that each indictment sets forth no offence. They also assert that there is no averment of any "prejudice to the general public or oppression of any individual."

In *Commonwealth* v. *Dyer*, 243 Mass. 472, 485, it was said, "It is the consensus of opinion that conspiracy as a criminal offence is established when the object of the combination is either a crime, or if not a crime, is unlawful,[5] or when the means contemplated are either criminal, or if not criminal, are illegal, provided that, where no crime is contemplated either as the end or the means, the illegal but non-criminal element involves prejudice to the general welfare or oppression of the individual of sufficient gravity to be injurious to

---

[5] There has been adverse criticism of the general principle that a criminal conspiracy may exist where neither the means nor the purpose of an alleged conspiracy, although unlawful, would be criminal if done by an individual. See Perkins, Criminal Law, 531, 538–544; Williams, Criminal Law. The General Part (2d ed.) §§ 221–226; Anderson, Wharton's Criminal Law and Procedure, §§ 82, 93–101; Sayre, Criminal Conspiracy, 35 Harv. L. Rev. 393, 420–427; notes, 62 Harv. L. Rev. 276; 68 Harv. L. Rev. 1056, 1059–1067; 72 Harv. L. Rev. 920, 940–945. See also *Krulewitch* v. *United States*, 336 U. S. 440, 445, 449–450. *Shaw* v. *Director of Pub. Prosecutions*, [1962] A.C. 220, 269, 276–282, 283, 291, 292–294. Cf. Am. Law Inst., Model Penal Code (Tent. draft No. 10, May 6, 1960), § 5.03, and comments, pp. 96, 102–104. The code confines criminal conspiracy "to cases where the conspiratorial objective is a crime."

the public interest." See *Commonwealth* v. *Hunt,* 4 Met. 111, 123 (see, however, pp. 127–136); *Commonwealth* v. *Waterman,* 122 Mass. 43, 56–57 (holding sufficient an indictment for conspiracy "to cause it falsely to appear" that a marriage has taken place by false personations and representations).[6] See also *Commonwealth* v. *Stuart,* 207 Mass. 563, 569–570. Cf. *Commonwealth* v. *Chagnon,* 330 Mass. 278, 281. Bessette argues that these general principles have not been broadly applied in Massachusetts in recent years. He in effect would have us interpret the term "unlawful" as meaning "criminal." Earlier decisions giving some support to this view (see e.g. *Commonwealth* v. *Eastman,* 1 Cush. 189, 226; *Commonwealth* v. *Shedd,* 7 Cush. 514, 515–516; *Commonwealth* v. *Prius,* 9 Gray, 127, 128, and *Commonwealth* v. *Wallace,* 16 Gray, 221, 222–224) were distinguished in the *Dyer* case, 243 Mass. 472, 484–485. Only a few cases since the *Dyer* case have discussed at all, or involved even indirectly, a conspiracy to accomplish (a) an unlawful but not criminal purpose, or (b) a lawful purpose by unlawful but not criminal means.[7] See *Commonwealth* v. *Lopes,* 318 Mass. 453, 454; *Commonwealth* v. *Engleman,* 336 Mass. 66, 68–69. See also *Commonwealth* v. *Chagnon,* 330 Mass. 278. These later cases, however, did not purport to limit the *Dyer* case, 243 Mass. 472, 485, and we do not regard them as doing so.

The recent decisions undoubtedly have tended to apply the principles of criminal conspiracy primarily to group arrangements which have a criminal purpose or contem-

[6] This court there said, "It is not always essential that the acts contemplated should constitute a criminal offence, for which, without the element of conspiracy, one alone could be indicted. It is the combination of two or more to do something unlawful, either as a means or as an ultimate end, which constitutes the crime; and many acts not punishable by indictment have been held to come within this definition. It is said to be sufficient if the end proposed, or the means to be employed, are *by reason of the power of the combination, particularly dangerous to the public interests,* or particularly injurious to some individual, although not criminal" (emphasis supplied).

[7] Even in some of these cases, there seems to have been involved a conspiracy to commit a crime. See e.g. *Commonwealth* v. *Benesch,* 290 Mass. 125, 134–137; *Commonwealth* v. *Rudnick,* 318 Mass. 45, 49. Also, in the *Dyer* case there were aspects of actual criminality in the object and proposed means of the conspiracy (see 243 Mass. 472, 489–490).

plate the use of criminal methods. Nevertheless, in view of the *Dyer* case, we are not prepared to say that criminal conspiracy has been completely restricted to this extent. The later discussion in the *Dyer* case, 243 Mass. 472, 489 (conspiracy for a monopoly) shows that the term "unlawful," in relation to a conspiracy, was thought to include situations where the purpose of a group plan or the proposed means of accomplishing that plan, even if not criminal, involve "an evil intent to oppress and injure the public" (or, perhaps, third persons) by activity, which is "illegal, void and against public policy."

In view of the conclusion which we reach, it is not now necessary to determine precisely when, in situations comparable to that presented in the *Dyer* case, joint action may create additional dangers and risks sufficient to make criminal as a conspiracy an agreement upon a plan for unlawful acts which would not be criminal when done by individuals separately. We think it plain, however, that the term "unlawful," as used in the criminal conspiracy cases (where neither a criminal object nor criminal means are in contemplation), is limited in any event to a narrow range of situations, (a) where there is strong probability (as in the monopolistic plans involved in the *Dyer* case) that the execution of the plan by group action will cause such significant harm to an individual or to the general public, as to be seriously contrary to the public interest, and (b) where the unlawfulness of objective or contemplated means is substantial and clear. There is sound reason for such limitation. As Perkins, Criminal Law, 544, points out, a more inclusive definition of "unlawful" might "be held void for vagueness under the Due Process Clause [of the Federal and Massachusetts Constitutions] unless what is . . . proscribed is spelled out with sufficient clearness to guide those who would be law-abiding and to advise defendants of the offense with which they are charged."[8] Even as limited by this opinion, the rule of the *Dyer* case is necessarily in-

---

[8] See *Commonwealth* v. *Carpenter*, 325 Mass. 519, 521; *Commonwealth* v. *Oliver*, 342 Mass. 82, 88; *United States* v. *L. Cohen Grocery Co.* 255 U. S. 81, 89–93; *Musser* v. *Utah*, 333 U. S. 95, 97; *Winters* v. *New York*, 333 U. S. 507,

definite and its application in a particular instance may present serious problems. This circumstance suggests strongly that certainty of statement of the criminal law would be greatly promoted by legislative definition of the types of unlawful, but not criminal, objectives and proposed means which may constitute elements of criminal conspiracy. See e.g. the discussion, *infra,* of 18 U. S. C. § 371 (1964).

2. The Commonwealth contends that the indictments in effect allege a conspiracy to defraud the Commonwealth by depriving it of the protection of art. 65 of the Standard Specifications. It is argued that at common law a conspiracy to perpetrate a fraud on the government was a crime. See L. Hand, J., in *Falter v. United States,* 23 F. 2d 420, 423 (2d Cir.), and cases discussing forms of "public" fraud, e.g. *Rex* v. *Wheatly,* 2 Burr. 1125, 1127. See also *Vertue* v. *Lord Clive,* 4 Burr. 2472, 2475–2477. These indictments, however, do not in terms allege a conspiracy to defraud. Thus various Federal cases dealing with the statutory crime of conspiracy to defraud the United States are not controlling. The Federal statute, 18 U. S. C. § 371 (1964), and its predecessors, have been broadly interpreted and might well have made criminal conduct such as this record shows, if the conduct had been directed at the Federal government. See *Haas* v. *Henkel,* 216 U. S. 462, 479; *Hammerschmidt* v. *United States,* 265 U. S. 182, 188; *United States* v. *Harding,* 81 F. 2d 563, 566–568 (Ct. App. D.C. — discussing a conspiracy to obstruct lawful functions of the Federal government); *Heald* v. *United States,* 175 F. 2d 878, 880 (10th Cir.). See also *United States* v. *Vazquez,* 319 F. 2d 381, 384 (3d Cir. — dealing with a case where no conspiracy in fact was shown). Cf. *United States* v. *Cohn,* 270 U. S. 339, 346. The breadth of the Federal general conspiracy statute is discussed by Mr. Justice Frankfurter, dissenting, in *Parr* v. *United States,* 363 U. S. 370, 401. To this Federal statute there is no Massachusetts statu-

515–516. See also *Cramp* v. *Board of Pub. Instruction,* 368 U. S. 278, 287–288; Am. Law Inst., Model Penal Code (Tent. draft No. 10, May 6, 1960) pp. 102–104.

tory parallel.[9]  In the absence of a Massachusetts statute phrased in closely comparable language, the force of the Federal cases as precedents is only by way of analogy.

3.  Where there is alleged a conspiracy to commit a criminal offence, an indictment for criminal conspiracy generally in accord with the forms suggested in G. L. (Ter. Ed.) c. 277, § 79 (see p. 3250), will suffice.  *Commonwealth* v. *Kiernan,* 348 Mass. 29, 33–34.  The indictments before us, however, are not for conspiracy to commit a crime.  They do not in terms aver (cf. *Commonwealth* v. *Judd,* 2 Mass. 329, 335–336) a purpose to defraud or harm seriously the Commonwealth, the general public, or any person.  Cf. the *Dyer* case, 243 Mass. 472, 480, where the indictments charged a conspiracy to create a monopoly "to cheat and defraud the public."  Cf. also the *Hunt* case, 4 Met. 111, 121–123.  There is no allegation of other facts tending to show that the violation of art. 65 was likely to be of serious or substantial consequence or to cause loss to the Commonwealth, to the public or any stated portion of it, or to any individual.  So far as appears from the indictments,[10] the violation was merely a breach of contract and not necessarily a material breach.

In a case where the Commonwealth does not contend that an alleged conspiracy has a crime as its object or contemplates the use of criminal means to accomplish a lawful ob-

---

[9] See for general provisions concerning conspiracy, G. L. c. 277, § 79 (forms of indictment for conspiracy to commit certain felonies); and § 63 (statute of limitations).  Special conspiracy statutes include G. L. (Ter. Ed.) c. 93, §§ 9–11 (including § 9A, inserted by St. 1961, c. 432, collusive bids), concerning trade, § 13 (unreasonable increase of prices of necessaries of life); c. 94, § 213A (as amended through St. 1960, c. 204, § 2), conspiracy to violate the narcotic drugs law; c. 123, § 110, as amended through St. 1937, c. 136 (commitment of a sane person); c. 128A, § 13C, inserted by St. 1950, c. 111 (affecting result of a race).  See also G. L. c. 149, § 24, as amended by St. 1950, c. 452, § 4 (concerning peaceful persuasion in labor disputes); c. 266, § 53 (agreement concerning certain bank transactions).

[10] The indictments do allege (a) the names of the participants, (b) the period of the combination, (c) the nature of the proposed allegedly unlawful act, i.e. "to assign the work" under a contract without the department's previous written consent, (d) the objective (violating art. 65 of the Standard Specifications), and (e) that the alleged conspirators "well knew" that the acts constituted such a violation.  It is not alleged, however, even that Bessette was director of the division, or what his duties were.

ject, there should be precise averments of facts showing that the alleged agreement is very clearly within the principles stated in the *Dyer* case. The express allegations here fall short of such a showing.

From the very general allegations it could be inferred that Bessette knowingly violated, by agreement with others, whatever department policy lay behind the use of art. 65 in the contracts. No allegations, however, tend to show the significance of that policy or that its violation by combined action (a) would cause loss to the Commonwealth, or any material interference with, or obstruction of, departmental operations,[11] or (b) would be "particularly dangerous to the public interests" (see fn. 6).

4. Because the indictments as drawn did not allege a crime, we do not reach questions based upon the evidence.

*Exceptions sustained.*

---

[11] Provisions designed to preserve honest methods in the award and performance of public contracts, of course, affect the public in some degree and are in the public interest. See *Pacella* v. *Metropolitan Dist. Commn.* 339 Mass. 338, 342. The violation of art. 65, however, has not been made a criminal offence and the indictments leave it wholly uncertain whether and to what extent such a violation may have public significance.