COMMONWEALTH *vs.* EDWARD F. GILL
(and a companion case[1]).

Middlesex.    February 14, 1977. — May 24, 1977.

Present: HALE, C.J., GOODMAN, & ARMSTRONG, JJ.

*Conspiracy. Public Officer. Public Works. Contract,* Public works, Bidding for contract, With municipality. *Municipal Corporations,* Contract. *Pleading, Criminal,* Indictment. *Practice, Criminal,* Motion for finding.

Indictments which charged the defendants with conspiracy "to cause a contract . . . to be awarded by [a city] . . . to a person who was not the lowest responsible and eligible bidder on the basis of competitive bids publicly opened and read in the manner provided by . . . [G. L. c. 30, § 39M]" were sufficient to indicate that the contemplated objectives of the charged conspiracy were unlawful and that those objectives would harm the general public and would be seriously contrary to the public interest. [338-344]
At a criminal trial, there was sufficient evidence to warrant a conclusion that the defendants conspired to violate G. L. c. 30, § 39M. [344-350]

INDICTMENTS found and returned in the Superior Court on August 25, 1972.

The cases were heard by *Bennett, J.*

*James F. Sullivan (John J. Fitzpatrick* with him) for the defendants.

*Peter W. Agnes, Jr.,* Assistant District Attorney, for the Commonwealth.

---

[1] Commonwealth *vs.* Charles J. DiPanfilo.

HALE, C.J.   Edward F. Gill, then mayor of the city of Woburn, Charles J. DiPanfilo, the city solicitor, and one Wall were charged in indictments[2] returned in August, 1972, with conspiracy to violate G. L. c. 30, § 39M, in connection with the awarding of certain sewer contracts. After a jury waived joint trial Wall was acquitted, but defendants Gill and DiPanfilo were both found guilty on all three counts of indictments 102287 and 102290, respectively. The defendants' amended bills of exceptions, filed pursuant to G. L. c. 278, § 31, claim as error the denial of their motions to dismiss the indictments and the denial of their motions for findings of not guilty.

1. We first consider the defendants' motions to dismiss the indictments.[3]   Basically the defendants argue that the trial judge erred in denying those motions for the following two reasons: (1) the indictments failed to set forth a crime because they did not allege that the objective or means of the conspiracy would cause such significant harm to an individual or to the general public as to be seriously contrary to the public interest and (2) the indictments failed to set forth a crime because they did not allege a

---

[2] The grand jury returned three indictments, numbered 102286, 102287, and 102288, against the defendant Gill, each charging in three counts criminal conspiracy under G. L. c. 274, § 7, inserted by St. 1968, c. 721, § 1. Indictments numbered 102290 and 102291 also charging conspiracy were returned against the defendant DiPanfilo. Indictment 102288 was subsequently nol prossed. Findings of not guilty on all counts of indictments 102286 and 102291 were made for the defendants Gill and DiPanfilo, respectively. This left a three-count indictment against each defendant; the indictments, 102287 against Gill and 102290 against DiPanfilo, alleged essentially the same offenses.

[3] The motions for dismissal of the indictments indicate that the defendants' grounds for seeking dismissal were (1) that the indictments contain no allegation of a criminal object of the conspiracy or of a criminal means of attaining the object of the conspiracy; (2) that the indictments are multifarious in that the defendants are charged with the identical crime in other numbered indictments; (3) that the statute which the defendants are alleged to have violated is so broad, general and indefinite that it is unconstitutional and void for vagueness; (4) that the allegations contained in the indictments are so broad, general and indefinite that they fail to inform the defendants of the specific offenses with which they are charged, and (5) that the indictments fail to set forth offenses cognizable under the laws of the Commonwealth.

substantial or clearly unlawful means or object of the conspiracy.

The test of the sufficiency of the indictments is whether they "fully and plainly, substantially and formally" describe the crimes or offenses for which the defendants are held to answer. Article 12 of the Declaration of Rights of the Massachusetts Constitution. See *Commonwealth* v. *Welansky*, 316 Mass. 383, 395-396 (1944). By statute the indictment shall contain "[a] plain and concise description of the act which constitutes the crime...." G. L. c. 277, § 17. An indictment may use the words of a statute to define a crime. G. L. c. 277, § 17. *Commonwealth* v. *Bracy*, 313 Mass. 121, 123 (1943). See *Commonwealth* v. *Hare*, 361 Mass. 263, 266 (1972).

In the present case the Commonwealth has tracked the language of G. L. c. 30, § 39M, to allege the unlawful objective of the conspiracy. In pertinent part the indictments state that the defendants "did conspire ... to cause a contract ... to be awarded by the City of Woburn, to a person who was not the lowest responsible and eligible bidder on the basis of competitive bids publicly opened and read in the manner provided by ... [G. L. c. 30, § 39M], well knowing that the cost of the contract would exceed two thousand dollars."

The applicable language of G. L. c. 30, § 39M, as amended through St. 1967, c. 535, § 5, provides that "[e]very contract ... shall be awarded to the lowest responsible and eligible bidder on the basis of competitive bids publicly opened and read by such awarding authority forthwith upon expiration of the time for the filing thereof; provided, however, that such awarding authority may reject any and all bids, if it is in the public interest so to do."

Except where all bids are rejected this statute requires the awarding of the contract to the lowest responsible and eligible bidder determined after competitive bids have been filed pursuant to a publicized invitation. The same is true of contracts governed by G. L. c. 149, §§ 44A-44L. Although it might appear that the word "any" in G. L. c. 30,

§ 39M (as well as in G. L. c. 149, § 44D) would allow rejection of the low bid so as to result in the awarding of the contract to a person not the lowest responsible and eligible bidder, a long line of cases has determined that contracts subject to those provisions cannot properly be awarded to one other than the lowest responsible and eligible bidder. *Gifford* v. *Commissioner of Pub. Health,* 328 Mass. 608, 616 (1952). *East Side Constr. Co. Inc.* v. *Adams,* 329 Mass. 347, 354 (1952). *Rudolph* v. *City Manager of Cambridge,* 341 Mass. 31, 33 (1960). *Gosselin's Dairy Inc.* v. *School Comm. of Holyoke,* 348 Mass. 793 (1965). *Interstate Engr. Corp.* v. *Fitchburg,* 367 Mass. 751, 756, and 763 (1975) (Wilkins, J., dissenting). *Sears, Roebuck & Co.* v. *School Comm. of Burlington,* 3 Mass. App. Ct. 399, 401-402 (1975).[4]

The crime of conspiracy is not restricted to arrangements which have a criminal objective or contemplate the use of criminal means to accomplish a lawful objective. *Commonwealth* v. *Bessette (No. 1),* 351 Mass. 148, 153-154 (1966). In *Commonwealth* v. *Dyer,* 243 Mass. 472, 485 (1922), cert. den. 262 U. S. 751 (1923), it was said, "It is the consensus of opinion that conspiracy as a criminal offence is established when the object of the combination is either a crime, or if not a crime, is unlawful, or when the means contemplated are either criminal, or if not criminal, are illegal, provided that, where no crime is contemplated either as the end or the means, the illegal but non-criminal element involves prejudice to the general welfare or oppression of the individual of sufficient gravity to be injurious to the public interest." In *Commonwealth* v. *Bessette*

---

[4] As use of the word "any" does not establish an exception to the statutory requirement of awarding the contract to the lowest responsible and eligible bidder, it follows that there is no requirement that the indictment negate such an exception under the line of cases represented by *United States* v. *Britton,* 107 U. S. 655, 670 (1882); *Commonwealth* v. *Maxwell,* 2 Pick. 139, 141 (1824); *Commonwealth* v. *Tuck,* 20 Pick. 356, 362-363 (1838); *Commonwealth* v. *Hart,* 11 Cush. 130, 134-135 (1853); *Commonwealth* v. *Jennings,* 121 Mass. 47, 49 (1876); *Commonwealth* v. *Badger,* 243 Mass. 137, 141 (1922); *Commonwealth* v. *Lee,* 247 Mass. 107, 108-109 (1923).

*(No. 1)*, 351 Mass. 148 (1966), and in *Commonwealth* v. *Bessette (No. 2)*, 351 Mass. 157 (1966), the court was faced with determining the sufficiency of an indictment which charged neither a criminal object nor a criminal means in the perpetration of the conspiracy. In *Bessette (No. 1)*, at 154, the court confirmed the continued vitality of the *Dyer* rule in that area and in so doing stated the limits of the narrow range of situations to which that rule might be applied: "(a) where there is strong probability (as in the monopolistic plans involved in the *Dyer* case) that the execution of the plan by group action will cause such significant harm to an individual or to the general public, as to be seriously contrary to the public interest, and (b) where the unlawfulness of objective or contemplated means is substantial and clear." The court went on to say, "There is sound reason for such limitation. As Perkins, Criminal Law, 544 [1957] points out, a more inclusive definition of 'unlawful' might 'be held void for vagueness under the Due Process Clause [of the Federal and Massachusetts Constitutions] unless what is ... proscribed is spelled out with sufficient clearness to guide those who would be law-abiding and to advise defendants of the offense with which they are charged.' "

We must determine whether the indictments in the present case spelled out offenses under the *Dyer* rule as limited by *Bessette (No. 1)*, at 154, by showing that acts alleged to have been committed by the defendants would "cause such significant harm ... to the general public, as to be seriously contrary to the public interest." We do not regard the *Bessette* decisions as requiring that an indictment charging such a conspiracy contain a specific averment to the effect that the conduct alleged would cause that harm, as such an averment would merely be conclusory and would add nothing. See *Commonwealth* v. *Freelove*, 150 Mass. 66 (1889); *Commonwealth* v. *Kimball*, 299 Mass. 353, 354 (1938); *Frisbie* v. *United States*, 157 U. S. 160, 168 (1895); *United States* v. *Brogren*, 63 F. Supp. 702, 704 (D. Mass. 1945). Compare G. L. c. 277, §§ 33, 34. For a discussion of the revision and simplification of in-

Commonwealth v. Gill.

dictments see Note, Streamlining the Indictment, 53 Harv. L. Rev. 122 (1939). It is enough that the charges in the indictments are such as clearly lead to that conclusion.

In *Bessette (No. 1), supra,* at 156, the court concluded that the allegations of the indictment did not tend to show that a violation of a certain article of the "Standard Specifications" of the division of waterways of the Department of Public Works, which had been incorporated into a contract, "was likely to be of serious or substantial consequence or to cause loss to the Commonwealth, to the public or any stated portion of it, or to any individual." In fact, the court went on to say that "[s]o far as it appears from the indictments, the violation was merely a breach of contract...." *Ibid.* Likewise, in *Bessette (No. 2), supra,* in which the conspiracy charged was the failure to give the Commonwealth statutorily required advance notice of an award for extra work under a contract with the Commonwealth, the court, at 162, stated that "[n]o allegations showing any such serious probable effect [injury to the public interest] of the alleged conspiracy are made in this indictment. There are no averments tending to show that what was stated to be the object of the conspiracy, if carried out, would amount to more than a procedural irregularity, or that... the consequences would be likely to be seriously detrimental to the public interest in any stated respect." The court noted that it was not charged that the Commonwealth would have been harmed had the statutory notice been given late or not at all.

In contradistinction to the purposes of the statutes considered in the *Bessette* cases, the design of the competitive bidding statutes, of which § 39M is one, is "to establish genuine and open competition after due public advertisement in the letting of contracts... to prevent favoritism in awarding such contracts and to secure honest methods of letting contracts in the public interests. The main aim was to protect the public." *Morse* v. *Boston,* 253 Mass. 247, 252 (1925). The requirements of a competitive bidding statute must be strictly adhered to. The "[a]bsence of bad faith or

of corruption does not excuse non-compliance with the procedure established by the Legislature for the award of the contract." *Gifford* v. *Commissioner of Pub. Health,* 328 Mass. 608, 617 (1952). "Even the best of motives cannot excuse contravention of the statute." *Grande & Son, Inc.* v. *School Housing Comm. of No. Reading,* 334 Mass. 252, 258 (1956). Neither the reservation of a right to reject any and all proposals in the notice to contractors nor the possibility that some violation of the statute might result in a benefit to the public warrants disobedience of the statutory mandate. *Gifford, supra,* at 616. See *Interstate Engr. Corp.* v. *Fitchburg,* 367 Mass. at 760-761, n.16.

The Supreme Judicial Court stated in *Interstate Engr. Corp.* at 757-758, two complementary legislative objectives underlying G. L. c. 149, §§ 44A-44L, which apply with equal force to G. L. c. 30, § 39M. "First, the statute enables the public contracting authority to obtain the lowest price for its work that competition among responsible contractors can secure," and "[s]econd, the statute establishes an honest and open procedure for competition for public contracts and, in so doing, places all general contractors and subbidders on an equal footing in the competition to gain the contract."

Since the two *Bessette* cases there has been only one case in the Supreme Judicial Court or in this court that dealt with an indictment which charged a criminal conspiracy where the means or objective of the conspiracy was unlawful but not criminal — *Commonwealth* v. *Kelley,* 358 Mass. 43 (1970). In that case the defendant was charged with conspiracy to cause the award of contracts by the Massachusetts Turnpike Authority to a firm of engineers on the condition that the firm pay the defendant a salary for which he was to do no work and additionally that he be given certain common stock in that firm and two others. The court at 49 held that, as alleged, the object of the conspiracy was illegal and involved great danger to the public interest. It pointed out that one of the conspirators held a position of public trust with power for the accomplishment of public purposes and went on to say,

"The conduct described in the indictment's allegation of the means for the accomplishment of the object of the conspiracy is impermissible and legally indefensible in the transaction of public business. The alleged object of this conspiracy, the subversion for private profit of the power of public office, is as unlawful as the means alleged." Here too the objectives charged, namely, the letting of contracts without following the bidding procedures required by statute,[5] or the letting of such contracts to persons not the low bidders, were "impermissible and legally indefensible in the transaction of public business." We are of the opinion that the indictments in the present case set out with sufficient clarity the unlawfulness of the contemplated objectives of the charged conspiracy. Those unlawful objectives would cause significant harm to persons who were not afforded the opportunity to bid and to be awarded a contract for submitting the lowest bid; without question those objectives would harm the general public and would be seriously contrary to the public interest.[6]

2. The defendants' second contention is that the trial judge erred in denying their motions for findings of not guilty on indictments 102287 (Gill) and 102290 (DiPanfilo). Because the motions were presented at the close of the Commonwealth's evidence, "we must assess the evidence, in its light most favorable to the Commonwealth, as of that moment in the trial. *Commonwealth* v. *Kelley,* 370 Mass. 147, 149-150 (1976)." *Commonwealth* v. *Greene,* 372 Mass. 517, 520, n.2 (1977). The sole question raised by the motions is whether "on this evidence and reasonable inferences therefrom the . . . [judge, as trier of fact,] could

---

[5] The case was tried and was briefed and argued on the footing that the indictments charged that the only objective of the conspiracy was to let contracts for sewerage without seeking competitive bids.

[6] The Commonwealth has argued that a violation of G. L. c. 30, § 39M, is made criminal by G. L. c. 44, § 62, and that, therefore, the objective of the conspiracy was criminal rather than merely unlawful. We need not reach those issues as they are unnecessary to the resolution of this case. See generally *Commonwealth* v. *Oliver,* 342 Mass. 82 (1961).

find, beyond a reasonable doubt," that the defendants conspired to violate the competitive bidding provisions of G. L. c. 30, § 39M. *Commonwealth* v. *Shea*, 324 Mass. 710, 713 (1949). *Commonwealth* v. *Fillippini*, 1 Mass. App. Ct. 606, 612 (1973).

From the evidence, as disclosed by the bills of exceptions, the trial judge could have found that at the time of the letting of the contracts in question Gill was the mayor of Woburn (city) and DiPanfilo was the city solicitor. The city had been engaged in extending sewer lines throughout the city and prior to 1969 had apparently constructed a number of trunk and feeder lines. The sewerage construction in the city had been done on a piecemeal basis, with small parts of it being constructed as money became available from various bond issues. Further extensions of the system were discussed with a representative of an engineering firm engaged to plan and supervise certain of the extensions and merely to plan others. A representative of that firm discussed with Gill the portions of the system the installation of which would be supervised by his firm. He informed Gill that contracts for this work would be let on the basis of invitations for bids, to be advertised in the Woburn newspaper and in a trade publication.

Prior to 1970 it had been the practice of the city in all of its sewer construction projects to advertise for bids by newspaper publication. It was the practice of the city's engineering department, headed by one Olson, to prepare the plans and specifications and the advertisement for bids. All of these would then be brought to the public works department, of which Wall was superintendent. That department would then place advertisements in the newspaper and maintain a supply of plans and specifications for prospective contractors. Bids on the project would be filed with the public works department, and that office would prepare a list of bidders. The bids would be opened in the city council chambers in the presence of the public works superintendent and the city engineer (Wall and Olson). A contract and a contract requisition would then be typed in Olson's office and sent to the city auditor, one

Connolly, for his certification as to the availability of funds. He would then return the contract to Olson, who would then forward it to DiPanfilo for his signature, indicating his "approv[al] as to form." The contract would then be signed by Gill with an indication of his approval, and signed by Wall in behalf of the city. The original would then be returned to the auditor and copies would be sent to the public works department, the mayor, the city solicitor, and the city engineer.

On July 1, 1970, the first of the contracts for which no competitive bids had been sought was awarded. From July 1 until October 21, 1970, all contracts for sewerage construction were awarded on a noncompetitive basis. In awarding such contracts Olson would ask a particular contractor whether he was interested in a given part of the construction. The contractor would then be given a proposal form which appears from the exhibits before us to be somewhat different from the form subsequently used when competitive bidding was reinstated. The latter proposal forms provided for the pricing of three items of work required to be performed. The total price of each of these items was determined by multiplying the unit price as bid by the quantity of work called for. The three subtotals thus obtained, when added together, would comprise the proposed contract amount. However, in the proposal forms for the July 1 to October 21 contracts, the unit prices for two of those items appear to have been typed in prior to the issuance of the proposal, as were the figures on the computed subtotal for those items. This left only the unit price of one item to be bid,[7] and its subtotal to be computed by the bidder, unlike the proposals issued after October 21 which had blank spaces for all unit price items and subtotals. Also appearing on the proposal form for the noncompetitive bids were the instructions, "This contract will be awarded on the lowest unit price submitted for

---

[7] Even this figure appears to have been typed in advance on the proposal dated October 21, 1970.

item 1," and, "No bid that exceeds ... [a stated price] per linear foot for item 1 will be accepted."[8]

Seven contracts were awarded on the basis of noncompetitive bids. On all but one of the proposal forms the unit price bid for item 1 was the maximum figure set out in the instructions. In three of the seven contracts, the total for the three items had apparently been typed in on the same typewriter as the unit prices which were inserted by the engineer's clerk. Four of these seven contracts were awarded to G. J. Donohue, Inc., two to A S A Construction Co., Inc., and one to DeRosa, Inc. These were local firms operated by persons who knew the defendants. Donohue of G. J. Donohue, Inc., and DeTeso of A S A Construction Co., Inc., were longtime friends of the defendants and had made contributions to campaigns of the mayor. Donohue had been seen frequently in the mayor's office — about once a week during the summer of 1970.

The city auditor, Connolly, discussed the validity of such contracts with the mayor sometime in the summer of 1970. Gill indicated that "no bid was required, that no materials or supplies were being purchased," and that the letting of the contracts was none of Connolly's business. Connolly also asked DiPanfilo whether there had to be bidding on contracts (specifically for rental of equipment) where no purchase of materials was involved. DiPanfilo responded by stating that it was his belief that such contracts were not illegal.[9]

During the period when the noncompetitive contracts

---

[8] On the proposal forms issued after October 21 the language of the first instruction was omitted; on all but one of those forms it was replaced with, "This contract will be awarded on the lowest total price submitted for Item #1, 2, and 3 inclusive," and the latter instruction was omitted. We have no way of knowing what was on any proposal forms issued prior to those for the July 1 bids.

[9] The Commonwealth states its case in its brief as though the defendants and Connolly were all together at the time these conversations took place and that both conversations specifically concerned bids on the sewer contracts. This is a misstatement of what appears in the bills of exceptions.

were let, DiPanfilo went into Gill's office about twice a
week. Sometime in October of 1970 DiPanfilo told the
clerk in the engineer's office to tell Olson that any contract
over $2,000 would have to go out for bids or would have
to be advertised. The last of the noncompetitive contracts
was let on October 21, 1970. In November a bidding pro-
cedure was established or reinstituted whereby invitations
for bids were advertised on contracts over $2,000.

In the summer of 1971 one Leland, a reporter from a
Boston newspaper, questioned Gill and DiPanfilo about
the sewer contracts awarded over the course of the pre-
vious summer. Gill denied any favoritism but indicated
that the work had to be done quickly without time for bids
and that although large jobs "would be bid," the smaller
jobs could be done in a way that did not require competi-
tive bidding. Gill further remarked that he "did not inter-
pret the $2,000 bidding law as applicable." He also stated
that he had assumed that the contracts had been adver-
tised when they came to him for signing. DiPanfilo, while
noting that he did not know whether the contracts had
been awarded after competitive bidding when he had
signed them "just as to legal form," expressed surprise
when informed by Leland that competitive bidding had
not taken place.

To warrant the convictions of the defendants "it must
be shown that the defendant[s] w[ere] aware of the ob-
jective of the conspiracy which was alleged." *Common-
wealth* v. *Nelson*, 370 Mass. 192, 196 (1976). See *Com-
monwealth* v. *Kelley*, 359 Mass. 77, 88-89, 90-92 (1971);
*Commonwealth* v. *Beneficial Fin. Co.* 360 Mass. 188, 249-
250, 352-353 (1971), cert. den. sub nom. *Farrell* v. *Massa-
chusetts*, 407 U. S. 910, and sub nom. *Beneficial Fin. Co.*
v. *Massachusetts*, 407 U. S. 914 (1972). "[M]ere knowl-
edge of an unlawful conspiracy is not sufficient to make
one a member of it, but ... he must actively participate
therein and must do something in furtherance of it before
he is liable as a member." *Commonwealth* v. *Beal*, 314
Mass. 210, 222 (1943). The conspiracy need not be proved
by direct evidence as it is elementary law that a "con-

spiracy may be, and usually is, proved by circumstantial evidence." *Commonwealth* v. *Stasiun,* 349 Mass. 38, 50 (1965). "It is not essential to a conspiracy that parties meet or that they confer or formulate their plans. Common purpose may be inferred from concerted action converging to a definite end. Participation in the concerted action is necessary.... It is not necessary that all the conspirators join in every part of the unlawful transaction; the motives by which the several conspirators are actuated may be most diverse. The part each is to play, the reward or satisfaction to be received by each and the knowledge possessed by each of the scope and details of the affair may be widely at variance." *Commonwealth* v. *Beal, supra,* at 221, 223-224. See *Commonwealth* v. *Hunt,* 4 Met. 111, 123 (1842). "The acts of different persons who are shown to have known each other, or to have been in communication with each other, directed toward the accomplishment of the same object, especially if by the same means or in the same manner, may be satisfactory proof of a conspiracy." *Attorney Gen.* v. *Tufts,* 239 Mass. 458, 494 (1921).

We are of the opinion that the evidence was sufficient to warrant a conclusion that the defendants conspired to violate G. L. c. 30, § 39M. The judge could have found knowledge on the part of both defendants that contracts over $2,000 had to be awarded through competitive bidding. Contracts for the construction of sewers before July, 1970, had been advertised for bids. The seven contracts which were signed had proposals attached which, on the face of at least six of them, disclosed that there was in fact noncompetitive bidding. The judge could have inferred that this was known by Gill and that DiPanfilo also knew of and overlooked that fact in furtherance of an agreement with Gill that he do so. He could also have inferred from DiPanfilo's directive to the engineer's office in October of 1970, that DiPanfilo for some reason had decided to stop the practice which he and Gill had agreed upon.

While it is basic law that "[t]here can be no finding of guilt by association" (*Commonwealth* v. *Perry,* 357 Mass. 149, 151 [1970]), from the combination of the above fac-

tors the trier of fact could find a scheme of concerted
action converging to a definite end, directed toward the
accomplishment of the same objects by the same means,
and participated in by both defendants. The defendants'
motions for findings of not guilty were properly denied.

*Exceptions overruled.*