**In re D. FEDERICO COMPANY, INC., Debtor.**

**D. FEDERICO COMPANY, INC. and United States Fidelity and Guaranty Company, Plaintiffs,**

v.

**NEW BEDFORD REDEVELOPMENT AUTHORITY and the City of New Bedford, Defendants.**

**Bankruptcy No. 79–2289–HL. Adv. No. 80–0619.**

United States Bankruptcy Court, D. Massachusetts.

Dec. 29, 1981.

See also, 8 B.R. 888.

Edward D. Kutchin, Boston, Mass., for plaintiffs.

Raymond A. Letourneau, New Bedford, Mass., for defendants.

## FINDINGS AND RULINGS ON LIABILITY

HAROLD LAVIEN, Bankruptcy Judge.

This proceeding centers around a construction contract entered into between the Plaintiff, D. Federico Company, Inc. ("Federico"), and the Defendant, New Bedford Redevelopment Authority ("Authority"). Jurisdiction is based on 28 U.S.C. § 1471, an Order for Relief on behalf of the D. Federico Company, Inc. having been entered on September 18, 1980. The Plaintiff, United States Fidelity and Guaranty Company ("U.S.F.G.") is the surety on the payment and performance bonds naming the Authority as obligee and Federico as principal. It is uncontested that U.S.F.G., by virtue of its obligations under the bonds, has expended monies to complete the project. U.S.F.G. bases its standing on its right of equitable subrogation and on its status as assignee of all Federico's contract balances and claims. The Defendant, City of New Bedford, has assumed the liabilities of the Authority in connection with the contract in issue by virtue of a Closeout Agreement executed by and between the Department of Housing and Urban Development and the Authority.

The Plaintiff, Federico, a general contractor, held five public contracts with the Defendant Authority, as part of a substantial urban renewal program in the City of New Bedford. At issue in this case is Contract No. 5 of the South Terminal Urban Renewal Project, a contract for the reconstruction of the two earth-filled bulkhead piers, Homer's Wharf and Leonard's Wharf. Homer's Wharf lies adjacent to and directly north of Leonard's Wharf. The Plaintiffs are seeking monies due on account of construction work performed on this project. The claim largely concerns extensive extra work made necessary because of the failure of the Authority to adequately describe the ruins, including the Raymond concrete piles that lay below the mud line as a result of the collapse of one of the piers years before, and such ruins were an unanticipated interference with the rebuilding of the piers and had to be excavated. The bid documents referred to this material as:

*Excavation of Material Below Water*: Excavation of Material below water shall refer to the removal of silt, mud, gravel, concrete, timber and all other miscellaneous solid material which is below elevation two (2). This item is intended for removal of only that material to be removed around the exterior of the wharves, namely portions of the existing wharves which have fallen away from their original location on the wharf and that portion which must be removed for placement of piling and select granular material below elevation two (2).

The Authority maintained that this was adequate notice to the bidders to examine the area carefully and that if contractors did so, the true conditions would be readily apparent. The Debtor alleges that since the Authority had full knowledge and a detailed engineering study, it mislead the contractor with its description and its failure to make the report available.

In addition, the Debtor claims a balance on retainages, other extras, and interest while the Authority claims credits for work not completed or defective and penalties for delay.

As a further complication, many of the items under the contract have a unit price that must be multiplied by an amount which is determined by a final measurement, something never completed, apparently because the Authority prematurely discharged its engineering staff. This leads into another problem, because without final measurements and an engineering staff, there was no one to prepare the final punch list which would normally determine what was incomplete or defective and establish a completion date.

By agreement, the trial was bifurcated. Evidence and briefs were offered on the liability question only, with a trial on damages to follow.

The Plaintiffs' complaint is in 13 counts. Count I alleges breach of an implied warranty that the plans and specifications provided Federico were sufficient and accurately depicted conditions as shown. Specifically, they failed to depict substantial underwater obstructions which caused Federico to incur substantial expense in removing steel sheeting, excavating the obstructions, and then redriving the sheeting. Count II seeks damages for the same expenses described in Count I but based on the theory of misrepresentation. The Plaintiffs allege that the Authority knew of the existence and nature of the underwater obstructions, that the Authority knew or should have known that the information it provided to potential bidders did not adequately depict these underwater conditions, and that Federico reasonably relied on information provided it. Count III is a claim for the release of retainages held by the Authority. In Count IV, the Plaintiffs allege that the contract carried a line item for the maintenance and protection of vehicular and pedestrian traffic at a contract price of $140,000, that Federico has performed its obligation but that the Authority has breached its contract in failing to pay any amount due under this line item. Count V also seeks damages for performance on the maintenance and protection of traffic item but based on a contract implied-in-law, quantum meruit.

In Counts VI and VII, the Plaintiffs allege that the Authority ordered Federico to remove a portion of the wale system from the previously authorized elevation of $+0.5$ feet and to re-install the system at elevation $-3.0$ feet, and that this work was not within the scope of the contract and has not been paid for. In Count VI, the Plaintiffs seek damages based on an express contract. In Count VII, the Plaintiffs seek damages based on a contract implied-in-fact theory. Counts VIII and IX deal with expenses incurred in the extensive drilling required to install the sheet tie-back system under two buildings on the north face of Homer's Wharf. The Plaintiffs seek compensation for certain equipment rental charges and fuel costs. Count VIII seeks damages for breach of the terms of the Change Orders and Count IX seeks payment based on a contract implied-in-fact theory.

In Count X, the Plaintiffs allege that the Authority, in an effort to induce Federico to use domestic steel ($276 per ton, F.O.B. Pennsylvania, no price guarantee) rather than the Belguim steel ($396 per ton, F.O.B. jobsite guaranteed) and thus reduce the cost of the project, agreed to compensate Federico if the price of steel increased. The final price for the domestic steel was above that bid by Federico, and the Authority has refused to honor the agreement. The Plaintiffs therefore seek damages for the excess plus a reasonable profit. Count XI alleges the same facts but seeks compensation based on a contract implied-in-fact theory. Counts XII and XIII allege that

the Authority, through authorized personnel, directed Federico to clean out a previously existing 90-inch reinforced concrete pipe and informed Federico that this was work outside the scope of the contract for which extra compensation would be paid. The Authority has refused payment for performance of this work and Plaintiffs seek damages for breach of an oral contract. In Count XIII, the Plaintiffs seek compensation based on contract implied-in-fact theory for cleaning the pipe.

The Authority denies the allegations of each count of the Plaintiffs' complaint and counterclaims against the Plaintiffs, claiming liquidated damages for delay in completion of the project, damages for failure to perform certain work required under the contract, damages for defective performance of certain work, and damages for breach of warranty of performance in a workmanlike manner.

Taking the specific counts in order, except for Count III which we will not consider in this opinion since, obviously, until the Court has determined the amount of damages due Federico and the amount due the Authority on its counterclaim, the Court cannot determine what, if any, retainages may be due or whether, in fact, any are being wrongfully withheld so that penalty interest is due. The issue of retainages will be reserved until the determination on damages.

*Underwater Obstructions (Counts I and II)*

█ The focus of Federico's claims relate to substantial and unanticipated underwater obstructions is the east end and northeast corner of Homer's Wharf. The source of the obstructions as described in testimony and in the "*Engineering Report on the Reconstruction of Homer's Wharf* prepared by Goodkind & O'Dea, Inc. (*Report*), dated December, 1969, I find to be as follows. The original wharf's construction was stone walls on a timber crib. Sometime between 1936 and 1946 improvements were made to the wharf which included driving

... reinforced concrete sheet piling ... in front of the old wall, a concrete cap connecting the new concrete sheet piling with the old wall at mean low water, a new wall and concrete cap extending to elevation +9 placed on top of the first concrete cap, and a pile fender system in front of the new wharf wall. *Report, id.* at 4–5.

In June of 1969, the east end and northeast corner of the wharf collapsed into the Acushnet River. From the divers' reports that the piles were covered with mud and debris, and the testimony of the Defendant's expert witness, Mr. Littleton, it appears that the Raymond concrete piles fell outward and were buried by the stonework and earth fill which followed the piles into the water. This was the state of affairs underwater along the proposed sheeting line at the east end and northeast corner of Homer's Wharf at the time prospective bidders were visiting the site in April and May of 1974.

Federico contends that neither the bidding documents nor an above water visual inspection of the wharf alerted it, or would alert any other bidder,[1] to the substantial obstructions lying buried along the proposed sheeting line. The Authority was in possession of a report (the Goodkind & O'Dea *Engineering Report*) which would have given bidders additional information on the former construction of the pier and consequently the type of material to be excavated. The Authority failed to disclose the existence of the *Report*.

The Authority contends that the existence of the *Report* is irrelevant because substantially the same information was available, with reasonable diligence, to prospective bidders. The Authority contends that statements in the specifications, notations on the drawings, the location of the borings, and visible on-site evidence of the materials comprising the walls of the pier, were together sufficient to put the prudent bidder on notice that remnants of the old pier, in the form of sizable reinforced con-

---

1. From the bids of the other bidders, it would appear they made no more extensive an examination than Federico and contemplated nothing more than the obvious rubble.

crete piles, were likely to be present near the proposed sheeting line.

The written material given to each prospective bidder included a set of drawings, a set of contract document and specifications, and a set of boring reports. This material was prepared by Goodkind & O'Dea, Inc., an independent engineering company and its sub-contractors. The contract drawings showed, on sheet 6 of 14, "the approximate limits of the existing wharf" and there was a notation on sheet 9 of 14 at the east end of the old wharf that "contractor shall excavate material as necessary to return to original depth." The Instructions to Bidders contained an exculpatory clause advising prospective bidders to become acquainted with conditions existing at the job site.[2] Within Section 21.3.2 of the Technical Specifications, captioned "Excavating and Filling for Sheet Piles," it provided that

> The Contractor shall be required to obtain the services of a diver to inspect the condition of the bottom surface immediately prior to pile driving. Excavation of existing Boulders or other obstructions at the piling shall be accomplished before piles are driven.

The excavation of material below water required is described in Section 4.3.10 of the Technical Specifications:

> *Excavation of Material Below Water*: Excavation of Material below water shall refer to the removal of silt, mud, gravel, concrete, timber and all other miscellaneous solid material which is below elevation two (2). This item is intended for removal of only that material to be removed around the exterior of the wharves, namely portions of the existing wharves which have fallen away from

their original location on the wharf and that portion which must be removed for placement of piling and select granular material below elevation two (2). The area to be excavated below the proposed 90 inch R.C.P. shall also be paid under this item. No measurement under this item will be allowed for trenching, for tie-rods, or drainage pipe, or structures.

The boring reports showed that eight of the borings taken near Homer's Wharf were taken on the proposed sheeting line but that two, at the northeast corner, were taken 25 to 30 feet outside the proposed sheeting line. Each of the reports showed the underwater material to be composed of silt, sand, gravel, and scattered cobbles.

It is doubtful whether these written materials, taken alone, give adequate notice to a bidder that it may encounter old Raymond reinforced concrete piles up to six tons in size. However, the information available through a site investigation is another matter. During the course of the trial, there was a great amount of conflicting evidence submitted on this question. Federico's witnesses testified that an on-site visit at low-tide revealed only manageable pieces of granite, concrete, and miscellaneous rubble of no great size. Photographs of the site were introduced to substantiate their position. The Authority's witnesses testified that at an on-site visit at low-tide in the Spring of 1974, the tops of concrete piles were visible and photographs were introduced to support this testimony.

I find that enough of the pier was in place in the Spring of 1974 to put a prudent and qualified engineer on notice that the wharf walls were not constructed simply of stone on timber cribbing, that the east end

**2.** Section 3 of the Instructions to Bidders reads as follows:

*Inspection of Site*
Each Bidder should visit the site of the proposed work and fully acquaint himself with the existing conditions there relating to construction and labor, and should fully inform himself as to the facilities involved and the difficulties and restrictions attending the performance of the Contract. The Bidder should thoroughly examine and familiarize himself

with the Drawings, Technical Specifications, and all other Contract Documents. The Contractor by the execution of the contract shall in no wise be relieved of any obligation under it due to his failure to receive or examine any form or legal instrument or to visit the site and acquaint himself with the conditions there existing and the Local Public Agency will be justified in rejecting any claim based on facts regarding which he should have been on notice as a result thereof.

of the wharf had collapsed, that the intact portion of the pier contained substantial reinforced concrete members and therefore, that it was likely that the collapsed end of the wharf also contained substantial reinforced concrete members that now must lie in the river bottom below. Since on sheet 6 of 14 of the drawings the pre-collapse configuration of the pier is clearly identified relative to the sheeting line for the new pier, Federico should have been put on notice that substantial concrete masses could be obstructing the proposed sheeting line. When all this is coupled with the peculiar location of borings, the contractor's admittedly cursory examination, by not being sure it was made at low tide, by its failure to use a diver or even a rowboat to examine the perimeters of the pier, and by conducting the examination of the perimeters from a coast guard pier at least 200 feet away, was less than prudent. Therefore, I find no breach of warranty and no misrepresentation. *See Christie v. United States*, 237 U.S. 234, 35 S.Ct. 565, 59 L.Ed. 933 (1915); *Hollerbach v. United States*, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914); *Robert E. McKee, Inc. v. City of Atlanta*, 414 F.Supp. 957 (N.D.Ga.1976); *M. L. Shalloo, Inc. v. Riccardi & Sons Construction, Inc.*, 348 Mass. 682, 205 N.E.2d 239 (1965).

While I find that an on-site investigation would reveal enough to put the prudent contractor on notice of the type of potential obstructions, I do not find this situation to be parallel to that in an earlier case between Federico and the Authority decided in this Court[3] where I found that Federico was not entitled to compensation for additional pipe fittings made necessary by underground obstructions not depicted on the drawings. In that case, the Technical Specifications gave explicit notice that the location of underground structures shown on the drawings was approximate only.[4]

In the instant case, however, the Authority had, in the form of the 1969 *Engineering Report on the Reconstruction of Homer's Wharf*, enough of a description of the types of construction that had been employed on Homer's Wharf over the years, and a description of the existing (as of 1969) condition of the structure based on both a visual above-water examination and an underwater inspection to have alerted bidders to expect large obstructions in the form of Raymond Concrete Piles.

Further, the findings from the underwater inspection in 1969 may well have been more revealing than in 1974 after five years of tide action. For example, the *Report* read as follows:

> The diver's [sic] also inspected the failure area in an attempt to determine the nature of the failure. Assorted debris and earth converted the wall remnants. The ends of a few concrete sheet piles that were uncovered showed the smooth end toward the wharf while the rough end, assumed to be that formerly embedded in the concrete cap, was the farthest from the wharf. This seems to indicate that the wall fell over rather than "kicked out" at the bottom. *Report* at 9.

Also, the *Report* noted that although no information was obtainable concerning the actual lengths of concrete piles installed, the various sources examined indicated that the size of the piles would fall in the range of 12 inches to 20 inches thick and 15 to 30 feet in length.[5]

In sum, I find that the Authority had important information that it did not con-

---

3. *D. Federico Co., Inc. v. New Bedford Redevelopment Authority*, 8 B.R. 888 (Bkrtcy.D.Mass. 1981).

4. Further, it was found that the design engineers prepared the drawings from the best information available and did everything feasible to accurately depict existing utilities. Neither the design engineers, the bidders, nor the Authority could do anything more to ascertain the obstructions without the actual excavation. All parties were aware of these limitations on the drawings. Bidders were told that they could only rely on the approximate locations of the existing underground utilities as depicted in the drawings at their own peril, and the Authority did all it could be expected to do to bring that fact home to all bidders. *D. Federico Co., Inc. v. New Bedford Redevelopment Authority, supra* note 3, at 891.

5. Report at 5–6.

vey to bidders, that this information would have greatly assisted bidders in the preparation of their bids, and that this notification could have been accomplished by the simple addition of a sentence in the contract documents noting the availability of the *Report* or, in the alternative, adding to the items in Section 4.3.10 of the Technical Specifications "fallen Raymond Concrete Piles", or even the elimination of any description at all of the material to be excavated.

In these circumstances, Golden (the contractor) had every reason to believe that it was given all the information the D.P.W. possessed with regard to the conditions at the site and the amount of work ... that would be required to complete the construction of the highway. However, the D.P.W. had not disclosed all the information in its possession. *Alpert v. Commonwealth*, 357 Mass. 306, 319, 258 N.E.2d 755, 763 (1970).

In these circumstances, the Authority should not expect to receive as a gift substantial work it knew that the contractor would have to perform for its benefit and for which it should have expected to have to pay a fair price all because the contractor was less than conscientious in discovering the somewhat hidden problem. This is the kind of situation where the law imposes a duty upon one party to compensate another in order to avoid the former's unjust enrichment. *Bloomgarden v. Coyer*, 479 F.2d 201 (D.C.Cir.1973). On the other hand, equity also requires that Federico not get the benefit of extra charges that would not have been necessary if it had done a proper investigation of the site conditions. Federico must absorb the expenses that would have been avoidable if it had been conscientious. The Authority must compensate Federico to the extent it has not already been compensated, on a unit price (cubic yard) basis, up to the amount that a reasonable bidder who had access to the *Report* prior to the submission of its bid would have found necessary for performance of this work. For example, the unit price might be shown to be increased by some amount due to a need for larger excavation equipment and for

additional labor, but Federico would not be entitled to any form of credit for going from one piece of inadequate equipment to another or for delays associated with encountering these obstructions since I find that a proper investigation would have enabled Federico to have been prepared with the right equipment in the first instance.

The Plaintiff's brief mentions the increased quantity of material. However, the bid was based on unit price, and John Capacefalo, Federico's Chief Engineer, testified that in making the bid he wasn't concerned with a quantity estimate since the more they excavated at a unit price, the more they would be paid. Therefore, once quantity is determined, the amount due can be determined.

*Payment of the Traffic and Maintenance Line Item (Counts IV and V)*

■ Federico's bid, which was accepted by the Authority and incorporated into the contract without change, carried a line item ( # 34) for the maintenance and protection of vehicular and pedestrian traffic at a contract price of $140,000. This was a LUMP SUM ITEM. Federico claims that during the course of performance of the contract, it did perform the item as required by Section 19 of the contract specifications, that it has made demands for payment, and that no monies have been paid under this item. The Authority contends alternatively that the item was orally waived or that Federico has not performed and, hence, no payment is due.

The facts surrounding the oral waiver theory are dealt with in subsequent counts dealing with compensation for steel prices.

Section 19 of the contract specifications details the contractor's obligations. It seems the work required under 19.3.1 (vehicular traffic) and 19.3.2 (pedestrian traffic) would not have been substantial because the location of the project did not appear to impinge on the flow of traffic except for persons seeking access to the actual piers. The principal work would probably have been done under 19.3.3 (provision for private access). In any event, Section 19 is the measure of performance.

Federico submitted testimony on the following as evidence of performance: Federico personnel hand-carried fish from the fish processing plants to trucks when the construction work prevented the trucks from having access to the plants. Regular efforts were required to keep cars from parking in areas of the pier that would impede work progress. Federico constructed a loading platform for fishing boats using the Aiello fish processing plant. Temporary roads were built around excavation areas and temporary power lines and lighting were carried to the processing plants.

Henry Horn, the Acting Director of the Authority, testified that Federico performed this item, and I so find.[6]

Had the NBRA desired to strike maintenance and protection of traffic from the scope of the work, it should have done so at the time it entered into the construction contract. Contractors are held to strict accord with their undertakings, *Albre Marble & Tile Co. v. Goverman*, 353 Mass. 546, 549 [233 N.E.2d 533] (1968), and it is not too much to ask the same standard of conduct from public agencies. *D. Federico Company, Inc. v. New Bedford Redevelopment Authority* [9 Mass. App. 141] 1980 Mass.App.Ct. Adv.Sh. 199, 202, 399 N.E.2d 1103, 1105 (1980).

The Plaintiff is entitled to be paid the contract price for this item.

*Lowering Walers (Counts VI and VII)*

■ The plans and specifications required a steel wale to be installed along the perimeter of Homer's Wharf and Leonard's Wharf at an elevation of minus three (-3.0) feet. Federico initially installed the walers at an elevation of plus 0.5 feet. John Capacefalo testified that Federico suggested raising the walers to that elevation so that high tide would not interfere with the progress of the work and, therefore, expedite the work. Federico did not receive written authorization, but oral authorization was given by Anton Brockelman, then the resident engineer for the Authority, to Federico's superintendent at the time.

It is the Authority's position that Federico only had permission to raise the walers to +0.5 on the *north* wall of Homer's Wharf underneath Aiello's and Parisi's buildings. Therefore, the Authority concedes the validity of this oral authorization by Brockelman to at least part of this work. In February, 1976, Brockelman, after some discussion with Manuel Viveiros, the Authority's Project Engineer (who may or may not have talked to the designer) authorized the raising of the tie rods.[7]

Walers on south side were set at +0.5 and on east end at +1.0. However, in February, *1977*, design architects informed the Authority that the east end tie rods must be at -3.0. Whether or not the oral authorization of Brockelman, by itself, was sufficient, I find that the Authority waived any objection. Since Authority personnel were present on a daily basis observing performance of Federico's work, and since Federico had initially sought permission to raise the height, it is unlikely that they would proceed to depart from the requirements of the plans in so visible a fashion absent some understanding between both parties that the departure was acceptable.

In June of 1977, Brockelman and Viveiros directed Federico to lower the walers to the elevation shown on plan. This order was oral, and no written change order was ever issued. The Authority was aware of Federico's position that the walers were installed as requested and this change would be an extra, and I so find; however, if the cost of originally installing the walers at (-3.0 ft.) would have exceeded the cost of installing them at (+.5 ft.) then the Authority is entitled to an offset for that difference.

---

6. To the extent that this item was conditioned on a saving in steel prices, I find that the price of steel in fact exceeded the original price of the foreign steel by more than the amount of this item.

7. Exhibit 120, Paragraphs 3–5.

*Additional Monies Due on Work Performed Pursuant to Change Orders No. 2 and No. 3 (Counts VIII and IX)*

Due to the encountering of a mass of reinforced concrete located under Aiello's and Parisi's buildings on Homer's Wharf and not anticipated in the original contract, it was necessary for the Authority to issue Change Orders No. 2 and No. 3. These Change Orders covered the drilling and boring through the concrete that would permit installation of the sheet tie-back system under the buildings. Change Order No. 2 was approved by the Authority on June 13, 1977 "in an amount not to exceed One Hundred and One Thousand ($101,000.00) Dollars." Due to an increase in the cost of labor, equipment, and materials necessary to complete the work as described in Change Order No. 2, Change Order No. 3 was issued on August 30, 1977, increasing the contract price another $175,000. In addition, $50,000 in "credits" [8] were transferred to the Change Order work. This made a total of $326,000 available for the performance of the tie-rod work. Both Change Orders were signed by Richard Federico on behalf of D. Federico Company.

The contractor was paid $327,552.26, less $31,587.11 in retainages, for work performed pursuant to Change Orders No. 2 and No. 3 but seeks an additional $13,668.00 for equipment rental charges and fuel costs. The contractor contends that it used, both in its pre-Change Order written proposals and in its computations of actual expenses for work performed, monthly equipment rental rates rather than daily or weekly rental rates because the monthly rates were the most favorable to the Authority. Further, it is industry practice that when a monthly rate is used, the lessor is paid the full amount of the monthly rental rate no matter how many hours the equipment was actually used during the month. On the daily rate, which is higher than the pro-rata monthly rate, the lessor is paid only for the actual number of hours the machine is in use. It is the contractor's contention that the Authority paid only for the actual hours each piece of equipment worked but applied the lower pro-rata monthly rate and that it is entitled to the full monthly rate. In addition, the contractor believes it is entitled to compensation for fuel used in the operation of the equipment since it is the practice in the industry for the lessee to pay fuel costs when equipment is rented on a monthly basis. There was testimony that oral demands for payment of these items were made on the Authority and refused.

Whether or not the additional equipment rental charges and fuel costs were within the scope of the Change Orders need not be decided for two reasons.

First, the June 17, 1977 letter from the Authority to the contractor states that reports were to be kept covering equipment used, labor supplied and work performed, and that these reports be signed by representatives of both parties. "Discrepancies or disagreements shall be resolved no later than the next day by Mr. Viveiros or [Mr. Horn]. Objections or exceptions shall be noted and signed by both parties." This certainly should have been done for at least the fuel supplied and was not. More importantly, the Change Order documents clearly show that the total contract price for the work being performed pursuant to these Change Orders was $326,000. Moreover, they make clear that the work was to be performed on a cost-plus limited basis in accordance with Section 109 sub-paragraph d(2) of the Specifications. A "cost-plus-limited basis" is defined in sub-paragraph d(2) as

[T]he net cost of the Contractor's labor, materials and insurance plus fifteen per cent (15%) of said net cost to cover overhead and profit, *the total cost not to exceed a specified amount.* [Emphasis added].

The Contractor argues that this sub-paragraph means that the Contractor is to be paid for all time and materials ex-

---

**8.** These credits to the Authority result from changes in the original contract necessitated and approved under Change Order No. 2.

pended and that the dollar limitation only triggers the need for the Authority to issue an additional Change Order. This conclusion is without any basis in the language of Section 109 and no other provision is cited by the Contractor. Where there is no ambiguity in a contract, it must be enforced according to its terms. *Freelander v. G. & K. Realty Corporation*, 357 Mass. 512, 258 N.E.2d 786 (1970). The Authority is not liable for the claimed additional compensation for equipment rental charges and fuel costs related to work performed under Change Orders No. 2 and No. 3 and is, in fact, entitled to a credit for the overpayment of $1,552.26.

*Increased Price of Steel (Counts X and XI)*

■ In the process of preparing bid on Contract No. 5, Federico solicited quotes on the steel for the sheeting that would constitute the walls of the piers. Stanhope (a company dealing in foreign manufactured steel) gave Federico a quote of $396/ton F.O.B. job site, a guaranteed price. This was the best price and the only available price at the time because U. S. Steel was refusing to make any quotes.

Bids were submitted May 24, 1974. Federico carried in its bid a line item price of $821,700 for 2,074 tons of imported steel at the Stanhope price of $396/ton guaranteed. Federico was the low bidder, but its bid was not immediately accepted as the price was higher than the Authority had anticipated. The Authority was considering rejecting all bids, revising the contract specifications to lower the cost, and re-letting the project. Between May 24, 1974 and September 30, 1974, the date the contract was finally signed, discussions took place among Federico, Authority representatives, and the designer regarding ways of lowering the cost of the project.

As one way of reducing costs, the Authority asked Federico to use steel manufactured by U. S. Steel instead of foreign steel because U. S. Steel had now quoted the Authority a price of $276/ton F.O.B. Pennsylvania but without a price guarantee. The Authority wanted the cost savings

potentially available through the use of U. S. Steel and Federico was willing to accommodate the Authority, providing it did not bear the risk of future price increases. Consequently, a deal was struck orally and without following the procedure for amending the specifications or the contract. Federico would buy its steel from U. S. Steel and use traffic line item ( # 34) to cover any increases in U. S. Steel prices; otherwise, it would waive the traffic line item ( # 34).

The Authority's representatives were well aware of the procedure for eliminating the traffic line item ( # 34) before the contract was signed. Their decision not to do so reflects their participation in the "understanding" that the traffic line item would be the vehicle for compensating Federico for rising steel prices.

The final price, including delivery, for the U. S. Steel was substantially above that which was bid by Federico.

Both parties chose to ignore the proper procedure because to make these substantial changes would require a re-bid under state statute.

A line of cases discuss the importance of strict and undeviating compliance with public competitive bidding statutes to prevent favoritism, fraud, or other abuses. *Datatrol, Inc. v. State Purchasing Agent*, 379 Mass. 679, 400 N.E.2d 1218, 1228 (1980); *Interstate Engineering Corporation v. City of Fitchburg*, 367 Mass. 751, 329 N.E.2d 128, 131 (1975); the same principle applies whether we are dealing with Mass.Gen. Laws ch. 149, Secs. 44A–44L or Mass.Gen. Laws ch. 30, Sec. 39M; *Commonwealth v. Gill*, 5 Mass.App. 337, 363 N.E.2d 267, 272 (1977); *Grande and Son, Inc. v. School Housing Committee*, 334 Mass. 252, 135 N.E.2d 6 (1956). Mr. Horn, the Executive Director of the Authority, testified that these arrangements were kept oral and informal because he knew that if he formalized them, there would have to be a new publishing and re-bid. *See* [1963–1965] Mass.Op.Atty.Gen. 126 (Sept. 25, 1963). They both deliberately participated in an improper short cut and must bear the conse-

quences. *Goldfarb v. Marchionne,* —— Mass.App. ——, 81 Mass.App.Adv.Sh. 1588, 425 N.E.2d 401 (1981). The contract should be enforced as written. Federico is only entitled to the price it bid on the steel. In choosing to use U. S. Steel instead of foreign steel with guaranteed price, it was consciously taking a gamble; i.e., getting the contract plus the $140,000 safety valve available through the traffic item (# 34) was worth the risk that the steel might skyrocket. For its part, the Authority having failed to eliminate line item 34 is bound by it.

*Cleaning Sewer Outfall Pipe (Counts XII and XIII)*

▮ As part of its contract, Federico was required to connect an existing 90 inch reinforced concrete pipe (R.C.P.) and to install additional 90 inch R.C.P. to the point shown on the plan. When Federico uncovered the end of the existing pipe, they found it filled to approximately one-half its diameter with silt, fish waste, and miscellaneous debris. This debris extended back about 100 feet and effectively restricted flow through the pipe. The problem was caused by the fact that the existing pipe did not have a full gravity system that would flush it clean, a problem not caused by Federico in any way.

Brockelman instructed Federico's superintendent to clean out the pipe. John Capacefalo, Federico's chief engineer, objected to performing the cleaning work on the basis that it was work outside the scope of the contract. Capacefalo testified that Brockelman instructed him to go ahead with the cleaning and Federico would be paid for it. He further testified that Viveiros had told him the same thing.

Capacefalo allowed Federico personnel to go forward with the work and instructed his superintendent, who at this time was Gary Edwards, to keep daily records on costs. These were kept in the form of extra work reports and were introduced as Exhibits P–15 through P–15–E. No written preauthorization, i.e., change order, was obtained nor was a formal protest made. Capacefalo gave the following explanation: In similar situations during the preceding

year-and-a-half, the Authority (no doubt meaning certain employees of the Authority) had preferred to compensate Federico for work performed outside the contracts by charging the work performed to some unit price line item rather than going through the more cumbersome process of issuing a formal change order. Since Federico had been adequately compensated in the past through this method, Federico assumed it would also be compensated in this situation. Federico did not file a protest and, hence, was not proceeding under that provision of the contract.

The Authority has two responses. First, neither Brockelman nor Viveiros had the authority to commit the Authority to additional payments. Second, the work performed was within the scope of the contract, specifically, section 20.2 under

Preparation of Site and Miscellaneous Work:

*20.2 Basis of Payment*: Payment for Preparation of Site and Miscellaneous Work will be made at the lump sum price in the BID PRICE FOR SITE IMPROVEMENTS. The lump sum price shall include everything necessary for providing and doing everything in preparation for the work to be done under other items of the Contract, including establishment of the necessary construction plant and construction of necessary construction access roadways; also, for cleaning up the entire site of the work after specifically referred to in the Specifications and which is not included for payment in other items for the BID FOR SITE IMPROVEMENTS but which is necessary for the complete construction of the project set forth by this Contract.

Line item 33 is the line item for preparation of site and miscellaneous work and Federico submitted a lump sum bid price of $331,500. (The 90″ R.C.P. is paid under line item 3 at a unit price of $350 per linear foot).

Federico argues that cleaning work of this magnitude is not contemplated by that item. The item covers necessary preparatory work such as preparing the trench in which the pipe will rest. Federico contends

it could properly have connected the new pipe to the existing pipe without doing the cleaning work and would have been in complete compliance with its contract obligation. This contention would place Federico in the peculiar position of claiming that by connecting the pipes, even if they then could not perform their intended function, that it would meet the requirement to do that ... "which is necessary for the complete construction" even though, admittedly, cleaning was necessary for the system to function. Line item 33 was a lump sum bid of $331,500 and was intended to cover such unforeseen necessities as the cleaning of this pipe. This problem only arises because of the contractor's consciously ignoring the explicit provisions of the contract. We are, once again, confronted with an experienced contractor who knew the terms of the contract and its explicit provisions [9] for either obtaining change orders which it, in fact, did for a previous count or for performing the work under written protest, who nonetheless ignores the contract provisions. This item is not a compensable extra. *D. Federico Co., Inc. v. Commonwealth,* —— Mass.App. ——, 1981 Mass.App.Ct.Adv.Sh. 184, 415 N.E.2d 855; *Glynn v. City of Gloucester,* 9 Mass.App. 454, 1980 Mass.App. Ct.Adv.Sh. 605, 401 N.E.2d 886.

## Counterclaims

While the Authority is liable for the damages that Federico can prove under the various counts in which the Court has now determined that liability exists, the Authority, under its counterclaim as amended, seeks to establish nine counts of offsetting counterclaims as to which the Court finds and rules as follows:

In Count I, the Authority claims liquidated damages of $100 per day, totalling $105,200 for the period May 30, 1976 to April 17, 1979, the date the Authority claims to have terminated the Federico contract. I find, in accordance with testimony of Mr. Viveiros, the Authority's chief engineer, that the contract was 99% completed by December 1, 1978. Again, we are plagued with the problem of punch lists, final measurements, final inspections and acceptances, none of which were performed because of the Authority's premature termination of its engineering staff. Whatever the compelling necessity for the Authority to so act, that cannot be the cause of adding to Federico's liquidated damages. The contractor had substantially completed its proper obligation and even the Authority's self-serving letter of December 12, 1978, recites only four incomplete items, two of which the contractor did not recognize as its obligation, one was insignificant,

---

**9.** Exh. 4, The Technical Specifications states:
§ 110—CLAIMS FOR EXTRA COST
a. If the Contractor claims that any instructions by Drawings or otherwise involve extra cost or extension of time, he shall, within ten days after the receipt of such instructions, and in any event before proceeding to execute the work, submit his protest thereto in writing to the Local Public Agency, stating clearly and in detail the basis of his objections. No such claim will be considered unless so made.
b. ....
c. Any discrepancies which may be discovered between actual conditions and those represented by the Drawings and maps shall at once be reported to the Local Public Agency and work shall not proceed except at the Contractor's risk, until written instructions have been received by him from the Local Public Agency.
§ 113—DISPUTES
a. All disputes arising under this Contract or its interpretation ... whether involving law or fact or both, or extra work, and all claims for alleged breach of contract shall within ten (10) days of commencement of the dispute be presented by the Contractor to the Local Public Agency for decision... Any claim not presented within the time limit specified within this paragraph shall be deemed to have been waived, except that if the claim is of a continuing character and notice of the claim is not given within ten days of its commencement, the claim will be considered only for a period commencing ten (10) days prior to the receipt by the Local Public Agency of notice thereof.
b. ....
c. If the Contractor does not agree with any decision of the Local Public Agency, he shall in no case allow the dispute to delay the work but shall notify the Local Public Agency promptly that he is proceeding with the work under protest and he may then except the except the matter in question from the final release.

and the last was never performed and is the subject of one of the Authority's counterclaims.

Much evidence was offered by both sides on this issue from which at least two findings are clear. There was delay for which the Authority is entitled to liquidated damages, but Federico is entitled to recognition that some of the delay would fall within Section 111 of the Specifications dealing with Excusable Delay. Since the contract provides for a completion date, which was extended to October 30, 1976,[10] and for $100 per day liquidated damages, the burden will be on Federico in the damages trial to reduce the Authority's prima facie showing of a right to liquidated damages at the contract rate from October 30, 1976 to December 1, 1978 by proving excusable delay.

Since much of this evidence may already be in the record, the parties may stipulate that designated portions of the liability transcript shall be considered by the Court on this issue.

To the extent that the remaining counts of the Authority's counterclaim deal with defective work, there is conflicting testimony even among some of the Authority's former engineers as to the proper performance of the work. However, even if this testimony is to be discounted because of the antagonism created by the dismissal of these employees, the Authority cannot prevail on any of these defective workmanship claims except for Count III, the failure to apply coal tar epoxy to the bolts to prevent corrosion as to which timely notice was given, and the work was not done.

■ As to items added in Defendant's amended counterclaim (filed April 29, 1981), the principal issue is timeliness. We start with the following contractual provision of the General Specifications regarding the guarantee:

132. *General Guaranty*

Neither the final certificate of payment nor any provision in the Contract nor partial or entire use of the Improvements embraced in this Contract by the Local Public Agency or the public shall constitute an acceptance of work not done in accordance with the Contract or relieve the Contractor of liability in respect to any express warranties or responsibility for faulty material or workmanship. The Contractor shall promptly remedy any defects in the work and pay for any damage to other work resulting therefrom which *shall appear within a period of 12 months from the date of final acceptance of the work. The Local Public Agency will give notice of defective materials and work with reasonable promptness.* (emphasis added).

Despite the statutory requirements, the closest thing to a final punch list is Horn's letter of December 12th containing only the four items that have previously been discussed. Viveiros testified that this was really only a partial punch list, that he believed Federico to be 99% done by December 1, 1978, and that he and Brockelman never completed the punch list or final inspection. An underwater inspection was not conducted until the Spring of 1981. The punch list and inspection could not be completed because Viveiros and Brockelman were terminated as of February 1, 1979, and no engineers were subsequently hired to do this work. Section 132 provides a one year warranty from the date of final acceptance for the remedying of any defects. However, since the Defendant failed to prepare a final punch list, take final measurements, and prepare final quantities, the Court finds that the one year period runs from the date of substantial completion.

Guidance on this very point is provided by this court's Memorandum on Prospective Liability prepared in the other three cases involving the same parties herein.

The other non-paving items were not included on the December 22, 1977 final punch list and would appear to be claims

---

10. The Authority argues this extension was expressly made conditional on completion, but I find it was based on valid excusable delay.

for either breach of warranty or for defective workmanship which, under the contract, survived for a one-year period. Since the contracts were substantially completed in 1975 and 1976, December 8, 1978 is too late for these claims to have been made and there is no responsibility on the part of Federico or its surety for those items. Federico was not an unlimited guarantor of all potential and future problems. All things must come to a reasonable end and that is contemplated by M.G.L., Ch. 30, Section 39G. *In re D. Federico Co., Inc.*, 8 B.R. 888, 901 (Bkrtcy. D.Mass.1981).

Similarly, the Massachusetts Appeals Court reached the same conclusion:

[A] public agency cannot thwart the policy of G.L. c. 30, § 39G, by the simple expedient of failing to obtain, or withholding, a stamp of approval. *D. Federico Company, Inc. v. New Bedford Redevelopment Authority,* 9 Mass.App. 141, 1980 Mass.App.Ct.Adv.Sh. 199, 203–204, 399 N.E.2d 1103, 1106 (1980).

Furthermore, the evidence introduced at the trial clearly revealed that these alleged defects were not discovered within the year. Steve Cassidy testified that he discovered the existence of the items in Count II in October of 1980 and discovered the existence of the items in Counts IV through IX in late December of 1980. He also indicated that his investigations were self-initiated.

Although Robert Noyer stated that the Contractor substantially completed its work on the Project in the Summer of 1978, the latest date which this Court could conceivably consider to be the date of substantial completion, is the date of Federico's letter to the Authority requesting a final inspection, December 1, 1978. Simple addition reveals that these problems were discovered at a minimum of almost two years *after* the date of substantial completion.

Federico was not an unlimited guarantor of all potential and future problems. All things must come to a reasonable end. Therefore, the Plaintiff should not be penalized for the NBRA's negligence or inadvertence in failing to perform a final inspection.

However, to the extent that Count II deals not with defective work but with the failure to perform a part of the contract, namely, the installation of 4″ square washers and the bolts in Count V, the Authority may offer evidence strictly limited to the cost of this work had it been performed no later than the first six months of 1980.

Thus, the Authority may recover in the damage trial on its counterclaims for Count I, liquidated damages, Counts II and IV, bolts and washers not installed, and Count III, coal tar epoxy, all to the extent set forth in this Memorandum.

A conference to set the time for damage trial, resolve any problems of discovery, utilizing exhibits or transcript from the liability hearing, and any other preliminary matters has been scheduled on Thursday, January 14, 1982 at 2:00 P.M. in Courtroom 1116.